IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

Lynchburg Division

| | | |
|---|---|---|
| CVLR Performance Horses, Inc., | ) | Civil No. |
| | ) | |
| Plaintiff, | ) | 6:11-CV-00035 |
| | ) | |
| v. | ) | |
| | ) | |
| John L. Wynne, | ) | |
| | ) | |
| 1650 Partners, L.L.C., | ) | |
| | ) | |
| Rivermont Consultants, Inc. (formerly | ) | |
| The Rivermont Banking Company, Inc.), | ) | |
| | ) | |
| S & R Farm, L.L.C., | ) | |
| | ) | |
| Ralph Beck, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Shana Lester (formerly Shana Beck), | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED VERIFIED COMPLAINT

COMES NOW CVLR Performance Horses, Inc., by counsel, who moves this Court to enter judgment in its favor against the defendants for the grounds stated in this complaint.

## SUBJECT MATTER JURISDICTION

1.     This Court has jurisdiction of the subject matter in Count One pursuant to 28 U.S.C. § 1331 (federal subject matter jurisdiction).

2.     This Court has jurisdiction of the subject matter in Counts Two, Three, and Four pursuant to 28 U.S.C. § 1367 (supplemental  jurisdiction).

## PERSONAL JURISDICTION

3.      CVLR Performance Horses, Inc. ("CVLR") is a Virginia corporation with its principal

place of business in Goode, Virginia.

4.      John Wynne ("Wynne") is a citizen of Bedford County, Virginia.  He is a retired banker

and is the sole owner of Rivermont Consultants, Inc. (known as The Rivermont Banking

Company, Inc. during the times relevant to this lawsuit) and 1650 Partners, L.L.C.  At certain

times relevant to the complaint, Seth Twery, an attorney in Lynchburg, was an owner of

Rivermont.

5.      1650 Partners, L.L.C. ("1650 Partners") is a Virginia limited liability corporation with its

principal place of business in Bedford County, Virginia.

6.      Rivermont Consultants, Inc. (known as The Rivermont Banking Company, Inc. during

the times relevant to this lawsuit) ("Rivermont") is a Virginia corporation with its principal place

of business in Bedford County, Virginia.

7.      S & R Farm, L.L.C. ("S & R Farm") is a dissolved Virginia limited liability company

which had its principal place of business in Bedford County, Virginia prior to its dissolution.

8.      Ralph Beck is a citizen of Bedford County, Virginia and was a managing member of

S & R Farm at the time of its dissolution.

9.      Shana Lester is a citizen of Bedford County, Virginia and was a managing member of

S & R Farm at the time of its dissolution.

## STATEMENT OF FACTS

### A. FACTS RELATING TO PURCHASE OF RIDING CENTER PROPERTY.

10.     In late 2006, Crystal Rivers, President of CVLR Performance Horses, Inc. ("CVLR"),

responded at the office of John Wynne, the President of The Rivermont Banking Company, Inc.

2

("Rivermont"), to an advertisement for rental of pasture land. Wynne represented to Rivers that Rivermont was a bank[1]. Actually, Wynne was at that time incarcerated and on work-release, but Rivers did not know that. After many discussions, Wynne agreed, ostensibly on behalf of Rivermont, to finance the purchase of real estate and equipment for CVLR's business.

11. On or about October 12, 2007, Wynne contacted Charles Darnell, the President of ODNB, and told him that he had a contract to purchase the riding center property for $475,000.00, a statement that was not true. Wynne and Darnell had discussed the riding center project previously and Darnell had visited the property, so Darnell knew what Wynne was referring to when Wynne told him that he had a contract to purchase the property.

12. During September and October 2007, Wynne had been seeking bank financing for the riding center property and for another project, the construction of an investment beach house in Pawley's Island, South Carolina. Wynne had been unable to find financing at other banks. Banks were not loaning money in September and October 2007 because of the financial crisis occurring at that time.

13. ODNB, a small bank that had been granted conditional approval to begin operation only nine months earlier (on December 28, 2006), had lax loan approval standards. The plaintiff can

---

[1]     Wynne and Rivermont were committing the felony of unlawfully using a business name that indicated Rivermont was a bank. Va. Code § 6.1-112(A) states:

> No person, entity or organization not authorized to engage in the banking business or trust business in this Commonwealth by the provisions of this title or under the laws of the United States, or a business trust, shall (i) use any office sign having thereon any name or other words indicating that any such office is the office of a bank or trust company; (ii) use or circulate any letterheads, billheads, blank notes, blank receipts, certificates, circulars or any written or printed paper whatever, having thereon any name or word indicating that such person, entity or organization is a bank or trust company . . . .

Wynne and Rivermont did all these things, which is a felony under Va. Code § 6.1-112(D).

prove this because The Comptroller of the Currency investigated ODNB's loan practices and issued an agreed "cease and desist" order in OCC Case No. 2010-157, which stated:

> The Comptroller has found unsafe and unsound banking practices relating to inadequate capital planning; inadequate strategic planning; high levels of problem assets; an inadequate Allowance for Loan and Lease Losses (ALLL); inadequate problem loan identification and loan review; improper accounting for non-accrual loans; weaknesses in concentration monitoring; and weaknesses in the Bank's contingency funding plan.

14. On October 12, 2007, Charles Darnell of Old Dominion National Bank, acting as the "Loan Officer" prepared a "Loan Presentation," which stated that:

> John Wynne is looking to purchase the Serene Creek Run Riding Center in Lynchburg for $475,000. Crystal Rivers will manage the facility, providing services for everything to do with horses. She has in excess of 10 years' experience with horses, having owned her own training, breeding, circuit riding and riding instruction farm in Florida. They do not want to put any cash into the deal. Therefore, we are taking additional collateral as an abundance of caution to compensate for the 100% of cost financing.

15. The loan presentation "analysis of Personal Financial Statements" included as an asset of Wynne "a vacation home in Pawley's Island, SC valued at $1,000K with a $500K mortgage (owns 50%)." Darnell's loan presentation stated that:

> We currently do not have personal financial information statements or personal tax returns for Crystal Rivers. However, the Loan Officer knows that her guarantee will not add financial strength to this loan request through various pre-loan interviews. Her guarantee is being added as an abundance of caution as she will be part owner in the LLC to be established for the business entity. Settlement of the loan is contingent upon receipt of said information. As the current Equestrian Center is not our customer, we do not know the current income of said business. Therefore, we are relying on the expertise of Ms. Rivers [sic] experience as an equestrian trainer to be able to grow the business and bring in sufficient cash flow to cover debt service.

16. Rivers did not provide "personal financial information statements or personal tax returns" to ODNB in the period between the Loan Presentation on October 12, 2007 and the closing of the ODNB loan to 1650 Partners on November 20, 2007.

4

17.     The loan presentation explicitly stated that the following exceptions to bank policy were necessary for the bank to make the loan:  "Financial information is not current or missing (guarantor)"; income information is not verified (no personal tax return" [sic]; "cash flow coverage does not meet minimum standard"; and "loan-to-cost ratio does not meet minimum standard."  Nevertheless, Darnell wrote in the "Summary" portion of the Loan Presentation: "Loan is recommended as presented."

18.     On October 28, 2007, Wynne obtained the signatures of S & R Farms' members (Beck and Lester) and CVLR's President (Rivers) on a contract under which S & R Farms promised to sell the riding center property to "CVLR Performance Horses or Assignee."  Wynne never told ODNB that the contract to sell the property listed "CVLR Performance Horses or Assignee" as the purchaser.

19.     On October 29, 2007, Charles Darnell of ODNB issued a commitment letter to John Wynne which stated that the bank "approved your commercial real estate loan acquisition request."  The borrower was to be an "LLC to be formed."   The commitment letter stated that the guarantors were to be John Wynne and Crystal Rivers.  The commitment letter also stated that:

> General liability insurance in the minimum amount of $1,000,000, and hazard insurance equal to the appraised value is required prior to settlement naming Old Dominion National Bank as additional insured/loss payee.

20.     The bank also required that "The Articles of Organization/Incorporation/Association, Operating Agreement and Certificate of Good Standing for the LLC to be formed must be submitted prior to loan closing."

21.     Rivers saw the commitment letter on November 2, 2007.  She was willing to go along with the loan described in the commitment letter and in the contract.  In her mind, the purchaser

5

would be "CVLR Performance Horses."  An "L.L.C. to be formed" (of which she would be a member) would finance the sale by borrowing money from ODNB.  She thought that CVLR would give a "mortgage" to the new L.L.C. to secure its repayment of ODNB's loan to the new L.L.C.  She did not know that ODNB had been told by Wynne that 1650 Partners (which was not a new L.L.C.) would be the sole purchaser, even though CVLR had a contract to purchase the property.

22.     On November 15, 2007, Mary Lou Hopkins of ODNB faxed to Jennifer Richardson of Advantage Title a copy of the Commitment Letter, identifying the borrower as "1650 Partners LLC."  Rivers was not a member of 1650 Partners; she first heard of 1650 Partners at the closing on November 20, 2007.

23.     On November 19, 2007, Kelly Potter of ODNB placed a "Memorandum" in the "John Wynne File" at ODNB.  The memo stated:

> A $450K loan was approved to an LLC to be formed and guaranteed by John Wynne and Crystal Rivers for the purchase of the Serene Creek Riding Center in Lynchburg, VA.  The Borrower is now going to be an existing LLC which Mr. Wynne has owned for some time—1650 Partners, LLC.  The Articles of Organization have been changed to add Crystal Rivers as a minority owner of the LLC.  This will now be our borrower.  John Wynne and Crystal Rivers will be our guarantors.  We still do not have the personal financial statement and tax returns for Crystal Rivers. However, we are relying on the strength of Mr. Wynne for this loan, and the guaranty of Ms. Rivers is being added purely as an abundance of caution as she will be managing the day to day affairs of the riding center.

24.     ODNB prepared loan documents listing 1650 Partners as its borrower and provided those documents to Advantage Title, which conducted a closing of the sale of the riding center property from S & R Farm to 1650 Partners on November 20, 2011.

25.     Attorney Seth Twery prepared for Wynne an "Amended Operating Agreement of 1650 Partners, L.L.C."  Paragraph 5.02 of the Amended Operating Agreement stated:  "The Initial Capital Contribution to the Company of John L. Wynne shall be the amount of Nine Thousand

Nine Hundred Dollars ($9,900.00); and Crystal V.L. Rivers shall be the amount of One Hundred Dollars ($100.00)." This purported to give Rivers .01% of 1650 Partners, but neither Wynne nor Rivers made an actual capital contribution to the company.

26. Wynne presented the signature page of the operating agreement, an "Entity Authorization," and a "Guaranty" to Rivers at the November 20, 2007 closing of the riding center property. She signed the documents, thinking that it was CVLR's "mortgage" for the riding center property. Rivers did not know at that time that a "mortgage" consisted of a note and deed of trust and she relied on Wynne's statement that she had signed the "mortgage" for the riding center property, which had the result of conveying the property to CVLR. Rivers told Wynne that this is what she thought and he told her that her understanding was correct.

27. Following the closing ceremony on November 20, 2007, Advantage Title disbursed ODNB funds in the gross amount of $475,000.00 in consideration for the transfer of the riding center property to 1650 Partners.

### B. FACTS RELATING TO WYNNE'S ACQUISITION OF CVLR'S INSURANCE PROCEEDS.

28. CVLR, thinking that it owned the riding center property, purchased a general liability policy from American Bankers Insurance Company ("American Bankers") covering the riding center property, listing Old Dominion National Bank as the loss payee.

29. In February 2008, wind damage occurred at the riding center property. CVLR filed an insurance claim with American Bankers Insurance Company ("American Bankers"). The adjustor told Rivers to get three estimates for reconstructing the barn. Rivers obtained three estimates from general contractors. The insurance company approved a payment of $38,000.00 to repair the barn.

30.     At Wynne's request, CVLR showed Wynne the estimates that it had received from contractors.  Wynne told CVLR that he could get Glen White a general contractor with whom he worked, to do the work for less than $38,000.00.  CVLR agreed to allow White to do the work.

31.     On April 7, 2008, American Bankers issued to "CVLR Performance Horses, Inc. and Old Dominion National Bank" two checks (Check No. 2683641 for $2043.86 and Check No. 2683642 for $24,265.38) totaling $26,309.24.  Mary Lou Hopkins of ODNB wrote "CVLR Performance Horses, Inc." on a credit slip dated April 11, 2007.

32.     On April 18, 2008, John Wynne went to ODNB to show Kelly Potter, a bank employee, pictures of the damage to the barn.  He said that he "wanted to see about releasing funds" that he had been paid by American Bankers to CVLR.

33.     On April 20, Wynne emailed Potter and requested that he "get the insurance proceeds released so I can repair the buildings."  Wynne stated that Terrance White would do the work and claimed that White had "built for me over the last three years," although White did not have a Class B contractor's license as required by Va. Code § 54.1-1103.  He wrote that he "expect[ed] the costs to be around $10,000.00.  The remaining proceeds will be used to make capital additions to the property."  He wrote that "I would hope you would put the proceeds into the 1650 checking account."

34.     In the spring of 2008, Glenn White, the contractor whom Wynne had recommended, came to the riding center and began work reconstructing the barn.  Wynne told Rivers of CVLR that he was going to take some of the construction materials to his home for home improvements and he asked to borrow the Ford F-650 truck.  Wynne and Glen White instead used the materials and Rivers' truck on a commercial job site.  Rivers objected to Wynne's use of the truck for a purpose not related to the riding center because the vehicle was not insured by CVLR to be used

8

on a commercial construction site.  Glen White never came back to finish reconstructing the barn.

35.     Wynne sent a forged letter to Patrick Rose, the adjustor at "American Reliable Ins. Co." on September 18, 2008.  The letter was on the letterhead of Glen White and was signed with the initials "GDW," and the letter requested payment of attached invoices to John Wynne.

The letter falsely stated that "The project is complete and CVLR, Old Dominion Nat'l Bank and Mr. Wynne w/1650 Partners LLC wants [sic] to close the book on this project."  The letter is a forgery, because it is handwritten by John Wynne, but purports to be from Glen White, a licensed Class A contractor.

The letter states "per Mr. Wynne's instructions I am faxing all invoices for the above captioned claim [underlined in original]. "   The fax also said that: "All invoices have been sent to the bank.  This should allow you to process the final payment."  The repairs to the barn had not yet been completed and CVLR, the named insured, had not authorized the insurance company "to close the book" on the project.  The invoices attached to the fax were from "Terrance White T/A White Construction," but White was an employee of Wynne and was not a licensed contractor.  In the forged fax, Wynne requested that the insurance company "process the final payment" because Glen White had previously asked ODNB to pay all the money it received from the insurance company to Terrance White, who endorsed all of the checks to Rivermont.

The basis for the plaintiff's belief that Wynne forged the letters is:  (1) the instructions to close the books on the claim and process final payment are in Wynne's handwriting, even though he signed the letters with Glen White's initials (the plaintiff has obtained handwriting expamples of both Wynne and Glen White, compared the letter to the examples, and the September 18, 2008 letter was written by Wynne); (2) Wynne had a motive to forge the letter because all of

9

Glen White's handwritten fax cover sheets, sending invoices to ODNB, state "Please process this invoice for John L. Wynne 1650 Partners LLC"; (3) both Glen White and Terrance White were employees of Wynne, according to Wynne's April 20, 2008 fax to Kelly Potter at ODNB, when Wynne wrote that :Terrance White . . . who has built for me over the last three years will be doing the repairs" (ellipsis in original); and (4) Terrance White deposited all of the checks with endorsements "For deposit only" to Rivermont (an entity solely owned by Wynne).

36.     At least two of the invoices are also false, claiming payment for work that was not done. The July 22, 2008 invoice was incorrect because it claimed "final clean up," but all the debris was left on the site and was not cleaned up.  The September 5, 2008 invoice was false because it claimed "project completion," but the job was never completed.

37.     When neither Glen White nor Terrance White completed the repairs to the barn, CVLR expended money to complete the job.  However, at Wynne's direction, ODNB paid all of the $35,190.59 of insurance proceeds that it received on behalf of CVLR to Terrance White, an employee of Wynne, who endorsed to Rivermont each of the checks written to him by ODNB. The funds should have been paid to CVLR, the named insured.  Rivermont (which was solely owned by Wynne) and Wynne had no claim on the insurance proceeds.

## C.  FACTS RELATING TO PURCHASE OF THE FORD F650 TRUCK.

38.     On February 9, 2007, Wynne, acting for Rivermont, placed a Virginia Buyers Order for a 2002 Ford F450 truck at Battlefield Ford in Manassas, Virginia.  The sales price of the truck was $26,500.00.  The truck was titled in the name of Rivermont.  Wynne and Rivers agreed that the truck was for the use of CVLR, which operated and insured the vehicle.  The truck had mechanical problems that became apparent when Rivers and Wynne drove the truck on a trip to Ohio in late April 2007.  Wynne and Rivers agreed to try to trade the truck for a different truck.

10

39.     Rivers called Battlefield Ford in early May 2007, described the truck's problems, and asked Battlefield Ford to "make it right."

40.     On May 8, 2007, Rivers completed a Virginia Buyers Order (identified as Deal 176524) for a 2006 Ford F650 truck with 3936 miles and signed a Promissory Note in favor of Battlefield Ford, Manassas, Virginia in the amount of $76,508.86 for the purchase of the truck.  The "Total Delivered Price" was $100,697.13, but Rivers was given credit in the amount of $27,673.27 for the trade-in of the 2002 Ford F450 truck, making the "Balance Due on Delivery" $76,508.86.

41.     Also, on May 8, an "Odometer Disclosure Statement" was prepared at Battlefield Ford for the Ford F650.  The odometer statement was signed by both Mickee Gaddy of Battlefield Ford and Crystal Rivers, certifying that the odometer reading on May 8, 2007 was 3936 miles.

42.     A "Delivery Receipt" certifying delivery of the Ford F650 truck to "Buyer Crystal Victoria Lee Rivers" was signed and given to Rivers at Battlefield Ford on May 8, 2007.

43.     An "Application for Certificate of Title and Registration" was prepared at Battlefield Ford listing the owners of the F650 truck as Crystal Rivers and John Wynne on May 8, 2007.  A "Temporary Certificate" of title was issued by Battlefield Ford to "Crystal Victoria Lee Rivers" on May 8, 2007.

44.     On May 21, 2007, Rivermont and Wynne (as parties of the first part) and CVLR and Rivers (as parties of the second part) entered into a "Lease, Loan, and Contract to Buy Agreement" drafted by Wynne.  The agreement CVLR to pay Rivermont interest 8½% per annum on any money that CVLR borrowed from Wynne.  The agreement also required CVLR to pay the principal and interest owed by Wynne and Rivermont to Wynne's creditor if Wynne borrowed money to purchase equipment to sell to CVLR.

11

45.     The agreement also provided that CVLR and Rivers was deemed to have "borrowed various monies" and "agreed to purchase certain pieces of equipment to include" a 2002 F450 truck.  Under the agreement, CVLR and Wynne agreed to pay to Wynne "interest on any loaned money at the rate of 8½%" "beginning July 15, 2007."

46.     On June 18, 2007, Wynne sent a handwritten fax to Mickee Gaddy at Battlefield Ford stating:

> This is the deal as I understand it please confirm.  I am giving Battlefield title to the 2002 F450 with trade in value of $27673.27.  I am also to wire $16,000 [sixteen Thousand Dollars] to Battlefield.  Crystal Rivers is signing a $60508.86 promissory note to be held by David.  On July 1 2007 Crystal is to pay that note out.  Upon receipt of my $16000 wire the vehicle will be titled in the names:  John Leigh Wynne and Crystal Victoria Leigh Rivers.  Please notify me at Fax 434-455-4900 that this is your understanding.  Likewise fax me that you have received her promissory note, and upon this receipt I will wire the funds and mail title and odometer certification.  If any questions please put in writing and fax to me—This will avoid any miscommunication or misunderstandings.

47.     David Wells of Battlefield Ford responded by fax, stating "that is what I expected to happen."

48.     The same day (June 18, 2007), Crystal Rivers sent a fax to Battlefield Ford saying that John Wynne "is prepared to wire the additional $16,000 today.  I will send the original Guarantee of Title & Title.  I need another Promissory Note for the remaining balance $60,508.86.  Money will be wired to you from me for that amount."  Under the May 21 "Lease, Loan and Contract to Buy Agreement," Wynne had already committed in writing to loan her the money to purchase the truck.

49.     On June 28, 2007, Rivermont paid $16,000.00 to Battlefield Ford.  Battlefield Ford prepared a note to be signed by Rivers in the amount of $60,508.86.

12

50.     On September 20, 2007, J.R. Schaeffer of Battlefield Ford wrote to Rivers that nothing had been paid on the original $76,508.86 promissory note.  When she received the letter, Rivers asked Wynne why he had not paid Battlefield Ford for the truck.

51.     Prompted by Rivers' questions, on or about September 26, 2007, "The Rivermont Banking Co., Inc." applied for a loan from BB&T Equipment Finance for the purpose of paying Battlefield Ford the purchase price of the Ford F-650 truck.  Wynne faxed to BB&T a Buyers Order showing that the purchase price of the truck was $104,215.34, but Rivermont also received a participation fee of $3126.46 from BB&T.  The "BB&T Equipment Finance Loan and Security Agreement" signed by Rivermont required CVLR to pay 72 equal monthly installments of $1976.93, or a total of $142,338.96.

52.     Rivermont was required by BB&T to maintain collision insurance on the vehicle as a condition of the BB&T financing.  Wynne, acting for Rivermont, on September 27, 2007 signed an "Agreement to Furnish Insurance Policy" in which he agreed to provide Rivermont's "own Insurance Policy" on the truck.  Rivermont did not purchase an auto insurance policy, but kept the truck on Rivers' policy.

53.     A "Delivery Receipt" certifying delivery of the Ford F650 truck to "Buyer The Rivermont Banking Company Inc" was signed and given to Wynne at Battlefield Ford on September 27, 2007.  The "Delivery Receipt" certified delivery to Rivermont of the same truck that had been certified as delivered to Rivers on May 8, 2007.

54.     On September 27, 2007, Wynne, acting for Rivermont (the name "The Rivermont Banking Co Inc" appears twice on the document) signed an "Odometer Disclosure Statement" stating that the mileage on the odometer of the Ford F650 truck was 3936 miles.  This statement was false because there were 3936 miles on the truck on May 8, 2007 when Mickee Gaddy and

Crystal Rivers signed the "Odometer Disclosure Statement" for the same vehicle on May 8, 2007 and Rivers had driven the truck all through the summer of 2007.

55.     Wynne had the truck titled in the name of "The Rivermont Banking Company" on September 27, 2007, even though it had already been titled in the name of "Crystal Victoria Lee Rivers" on May 8, 2007.  Rivers did not know that title to the truck had been transferred out of her name and she did not consent to the transfer.

56.     Wynne obtained the benefit of the warranty for the truck engine by allowing Gail Hamilton of Battlefield Ford to forge, by changing the date on the "Warranty Registration Caterpillar Truck Engine" for the truck engine from May 8, 2007 (the date that Rivers originally signed the warranty form) to September 27, 2007 (the date that he transferred title of the truck to Rivermont) and by drawing a line through Rivers' name and writing "wrong sales info" next to her name.  On September 27, Wynne obtained the benefit of the Allison Transmission warranty by Gail Hamilton entering on the "Allison Transmission Extended Transmission Coverage Agreement Registration" that "The Rivermont Banking Co." was the owner of the warranty, based on signature "On File," but the signature of file was Crystal Rivers' signature, not a signature of Wynne or Rivermont.  Similarly, the signature on the "Caterpillar ESC On-Highway Vehicle Engines and Transmissions" warranty form is Crystal Rivers' "on file" signature, even though the owner of the warranty is listed as Rivermont.

57.     On September 27, 2007, Daniel Ulloa, a salesman employed by Battlefield Ford, prepared at Wynne's request a new Virginia Buyers Order, with the same deal number as the buyers order signed by Rivers on May 8, 2007, that identified "The Rivermont Banking Co Inc" as the purchaser of the same truck that Rivers had previously purchased.  The buyers order listed

the "Total Delivered Price" as $100,730.34 plus an extended service contract of $3485.00, but did not provide credit for any trade in or down payment, making the net sales price $104,215.34.

58.     Wynne, acting through Rivermont, committed wire fraud and bank fraud in obtaining the $107,341.80 from BB&T.  Rivermont falsely represented, by faxing to BB&T a copy of a "9/27/2007" Virginia Buyers Order (signed by Wynne as "Pres/CEO" of "The Rivermont Banking Co") stating that the balance due to Battlefield Ford was $104,215.34.  As outlined in Wynne's June 18, 2007 fax to Mickee Gaddy which described "the deal," Rivermont had paid $16,000.00 down and traded-in the 2002 F450 truck for $27,673.27, making the actual balance due to Battlefield Ford $60,508.86.

59.     Wynne, acting through Rivermont, committed wire fraud and bank fraud by wiring to BB&T a copy of a "9/27/2007" Virginia Buyers Order (signed by Wynne as "Pres/CEO" of "The Rivermont Banking Co") stating that the odometer reading on the vehicle on September 27, 2007 was 3936 miles when the odometer reading was higher than 3936 miles.  The plaintiff knows this because the odometer reading on the truck when Rivers picked it up on May 8, 2007 was 3936 miles and Rivers had been driving the truck all summer.

60.     When Battlefield Ford obtained the $107,341.80 in loan proceeds from BB&T, Battlefield Ford paid check No. 126905 in the amount of $43,673.27 to Wynne.

### B. FACTS RELATING TO RIVERMONT'S UNAUTHORIZED USE OF RIVERS' STATE FARM AUTO INSURANCE POLICY.

61.     On February 1, 2007, Wynne purchased a 1999 Chevrolet Tahoe and titled it in the name of Rivermont.  Wynne, without Rivers' knowledge and consent, telephoned Margie Callahan, Rivers' State Farm insurance agent, and told her that Rivers had authorized him to add Rivermont's 1999 Chevrolet Tahoe to Rivers' auto insurance policy.  Rivers had not authorized Wynne to do this.

15

62.    Callahan told Rivers that State Farm could not provide Wynne auto insurance because he had been convicted of hit-and-run DUI and had been incarcerated prior to November 2006.

63.    On April 16, 2007, according to Callahan's notes, Wynne requested that State Farm "re-instate" insurance coverage for the "Tahoe."

64.    On May 2, 2007, State Farm cancelled coverage of the 1999 Tahoe on Rivers' "car insurance policy" because even though Wynne had told State Farm that the policy also covered Rivermont's vehicles, the State Farm underwriting department (recorded in a memo dated April 19, 2007) recognized that its insured, Rivers, was not the owner of Rivermont.

65.    On September 13, 2007, Wynne telephoned Callahan, and applied for reinstatement of the coverage of his Tahoe on Rivers' policy, falsely claiming that Rivers was an employee of Rivermont.  A note posted by a State Farm employee on the application states, "Once all changes made, payments taken, etc.—John has requested you send him complete re-cap on all his policies."  Wynne did not own any State Farm policies; the only policy belonged to Rivers. Wynne paid the premium of $768.40 by a charge on his credit card.

66.    On October 9, 2007 (according to the claim submitted by Wynne to State Farm), Wynne's sixteen-year-old-son wrecked the Tahoe in an accident, resulting in a total loss of the vehicle.  Wynne called Rivers and asked her to call Callahan and tell her that his son had wrecked the vehicle.  Rivers called Callahan because she thought Wynne was upset.

67.    On October 22, 2007, Tammy Ginaven of State Farm telephoned Rivers and told her that State Farm was prepared to send a check to pay her claim.  She told Ginaven that she did not make a claim and, according to the State Farm Activity Log: "verified that she does not have anything to do with this vehicle so need to sw [sic] the owner John Wynne."  Ms. Ginaven then called Wynne who "verified he owns the Rivermont Banking Co. and Crystal could drive the

vehicle and should have been listed as driver not insured."  Ginaven asked Wynne to provide proof that he owned Rivermont, and Ginaven recorded in the State Farm Activity Log that Wynne said "he is willing to fax us additional (corpppw) [sic] showing his position."

68.     Wynne sent to State Farm a forged "2007 Annual Report" of Rivermont that was signed by Seth Twery on January 26, 2007.  The original document did not list Wynne as having a role in Rivermont.  Wynne changed the form signed by Twery in the following ways:  he checked the box entitled "addition," checked the boxes "officer" and "director" and added "John L. Wynne Chairman, President and CEO" to the form.  He faxed the forged form to "Sandy" at State Farm on October 26, 2007.

69.     Wynne obtained $10,630.00 in State Farm insurance proceeds as a result of the fraudulent claim, as recorded in the State Farm Activity Log.

### E. FACTS RELATING TO WYNNE'S FORGERY OF RIVERS' NAME ON 1650 PARTNERS CHECKING ACCOUNT.

70.     On October 1, 2008, Wynne forged Crystal Rivers' name on 1650 Partners L.L.C. Check No. 1020 and presented it for payment at Bank of the James.  At that time, Rivers was a member of 1650 Partners.  Bank of the James paid the forged check and presented it for collection to ODNB, which paid the forged check to him in the amount of $3000.00.

### F. FACTS RELATING TO WYNNE'S FORECLOSURE OF KAREN FOSTER'S HOME.

71.     In early 2006, Karen Foster, a Class A contractor based in Lynchburg, sought real estate financing from Rivermont.  Since Rivermont was called the "The Rivermont Banking Company," Foster thought Rivermont was a bank.

72.     On August 23, 2006, Karen Foster, who by that time considered Wynne to be her friend, executed a note in favor of Wynne in the amount of $40,000.00 on account of money that Wynne

had loaned her in small increments over a period of time.  The note was secured by a deed of trust on Foster's home at 2232 Ridgewood Drive, Lynchburg, Virginia.  Wynne made no demand for payment of the note.

73.     On September 25, 2008, Peter Sackett conducted a putative foreclosure sale of Foster's property at 2232 Ridgewood Drive.  Wynne bid-in the property for $40,000.00.

74.     Wynne knew there was a Bank of America mortgage on the property because he inquired about the balance of the loan at the local Bank of America Bank.

75.     Bank of America held the first deed of trust on the property, but Sackett did not pay Bank of America from the proceeds of the foreclosure sale.  Sackett spent the proceeds of the foreclosure sale for other purposes.  After Sackett had spent the foreclosure proceeds, Wynne paid Sackett $72,000.00 from the Southgate Leigh Wynne Trust to pay Bank of America, which received the funds on January 12, 2010.

76.     Wynne submitted a financial statement to ODNB.  The financial statement listed as an asset of Wynne the property at 2232 Ridgewood Drive.  Wynne stated that the property had a value of "$200,000" and a "no mtg [mortgage]."

77.     The financial statement said:

> This information and the information provided on all accompanying financial statements and schedules is provided for the purpose of obtaining credit for the Applicant(s) or for the purpose of Applicant(s) guaranteeing credit for others. Applicant(s) acknowledge that representations made in this Statement will be relied on by Creditor in its decision to grant such credit.  This Statement is true and correct in every detail and accurately represents the financial condition of the Applicant(s) on the date given below.

Wynne signed the statement on April 23, 2009.

78.     At the time the financial statement was submitted to ODNB, it was false because the Bank of America note had not been paid and the deed of trust had not been released.

18

79.     Wynne submitted the financial statement to support his application to renew 1650 Partners' $475,000.00 loan to purchase the riding center property and 1650 Partners' $25,000.00 working capital loan.  The loan required renewal every year, with no fee to renew.

80.     ODNB renewed the loan based upon Wynne's false financial statement according to the ODNB April 23, 2009 loan presentation prepared by Darnell.

## G. FACTS RELATING TO WYNNE'S DEALING WITH VICKI MARSH.

81.     Wynne's conduct relating to Vicki Marsh is essential to understanding the relationship between the predicate acts.

82.     Vicki Marsh is a long-time resident of Abingdon, Virginia and friend of John Wynne. Marsh owned an interest in a house on Pawley's Island, South Carolina.

83.     In September 2006, while Marsh was house-sitting for Wynne (who was in jail) at his house in Lynchburg, Marsh, while clearing a place for herself to sleep in Wynne's guest bedroom, saw a paper that described her property. The paper also listed "16 horses."  Marsh later asked Wynne about the papers on the bed, and Wynne said "it was to start up Rivermont," "$60,000 was to help Karen out" and "to help the girl with the horses out."  At that time, Rivers had no relationship with Wynne except that she rented pasture from him and had pledged sixteen horses as security.  Upon information and belief (based upon Wynne's statement to Marsh) Wynne had conceived of a unified scheme to defraud Marsh, Foster, and Rivers.

84.     On November 8, 2006, Wynne visited Marsh in Abingdon and bought a $60,000.00 Certificate of Deposit at First Bank and Trust Company ("First Bank") in the name of Rivermont.  Marsh opened a credit line which, upon information and belief, First Bank stated was granted because of the "influence" of Rivermont purchasing the Certificate of Deposit at First Bank.  Wynne's purpose in having Marsh obtain the line of credit at First Bank was to

19

bolster Marsh's credit score so that, with the temporary equity that he would create in her house at Pawley's Island, she could obtain a mortgage from another bank.

85.     On March 2, 2007, Marsh conveyed a one-half interest in her Pawley's Island property to Wynne.  Shortly thereafter, Wynne paid approximately $450,000.00 to a South Carolina court as settlement of the partition dispute with Marsh's co-owners.  Wynne obtained the funds by borrowing the money from a bank whose identity the plaintiff does not yet know (plaintiff knows that Wynne borrowed the money because he stated this in an April 10, 2010 letter to Marsh).

86.     On March 30, 2007, Wachovia loaned Marsh $501,461.75, secured by her property (half of which, by the time of the closing, had been conveyed to Wynne).  Marsh earns only $7000 per year and has no means of repaying the loan.  The proceeds of the loan were paid to Wynne and he made all the payments on the loan until he stopped making payments in September 2008. Wynne was never added as a borrower on the Wachovia mortgage even though he received the proceeds of the loan and obtained a half-interest in Marsh's property, however.

87.     Wynne intended to build a new house on Marsh's property.  In September 2007, Wynne found that he could not obtain financing to build the house with Marsh.

88.     Wynne listed his interest in the Pawley's Island house in the financial statement he provided to Darnell on October 12, 2007 when he sought financing from ODNB to purchase the riding center property.  He listed the market value of the house as "$1000K" (one million dollars).

89.     Wynne paid Marsh's Wachovia mortgage payments until September 2008 and made no mortgage payments after that date.  On a Saturday afternoon in September 2008 (Marsh cannot remember the exact date), Wynne told Marsh that he was going to let Wachovia foreclose, buy the property on a short-sale from Wachovia, and that she is "[expletive deleted] out of luck."

20

90.     Upon information and belief, Wynne has attempted to persuade Wells Fargo Bank, which now owns the Marsh note, to allow him to purchase the property for less than Marsh owes on the note.

### H. FACTS RELATING TO BREACH OF CONTRACT BY S & R FARM.

91.     S & R Farm entered into the October 28, 2007 contract, promising to sell the riding center property to "CVLR Performance Horses or Assignee."

92.     On November 13, 2007, S & R Farm directed its attorney, Sherwood Day, to prepare a deed conveying the property to 1650 Partners.

93.     On November 15, 2007, S & R Farm's members, defendants Ralph Beck and Shana Lester, executed the deed conveying the riding center property to 1650 Partners.  The deed was dated November 13, 2007, but was signed on November 15, 2007.  Herein, the deed will be referred to as the "November 13, 2007 deed" because November 13, 2007 is the date on the face of the deed.

94.     CVLR never assigned its contractual right to purchase the riding center.

(a)     The contract to purchase the riding center property is covered by the Statute of Frauds (under English law and the Virginia reception statutes (Va. Code § 1-200 and Va. Code § 1-201). and Va. Code § 11-2) and there has never been a writing that constituted an assignment of CVLR's contractual right to purchase the riding center;

(b)     CVLR did nothing to manifest an intention to transfer its right to purchase the riding center property prior to the execution of the November 13, 2007 deed conveying the property to 1650 Partners;

(c)     CVLR's conduct did not manifest an intention to transfer its right to purchase the

riding center property prior to the execution of the November 13, 2007 deed conveying the

property to 1650 Partners.  Teresa Polinek, the real estate agent who represented both seller S &

R Farm and purchaser CVLR, and the person who drafted the October 28, 2011 contract, has

stated in writing to the plaintiff:

> I was under the assumption that CVLR Performances [sic], Crystal Rivers, was
> purchasing the barn and that John Wynn [sic] was backing the financing. . . . At no time
> was it mentioned that anyone other than CVLR Performances, Crystal Rivers, would be
> purchasing the said property.  I was asked to put the purchaser as CVLR Performances or
> Assignee.  I was never contacted to change the Assignee from CVLR Performances to
> another party.

95.     S & R Farm sold the property to 1650 Partners, not to CVLR, which was a breach of

S & R Farm's contract with CVLR.

96.     As a direct and proximate result of S & R Farm's breach of contract, CVLR lost the

Benefit of its bargain to purchase the riding center and lost the expectancy of operating the riding

center.

97.     Beck & Lester dissolved S & R Farm.  They knew that CVLR had a claim against S & R

Farm because they had conveyed the property to 1650 Partners, when they knew (according to

their real estate agent) that their contract was with CVLR and CVLR had not assigned its right to

purchase the property.  They provided no notice of the dissolution to CVLR.

98.     When they dissolved S & R Farm, Beck and Lester distributed S & R Farm's assets

to themselves in two equal shares, as described in detail in "The Fifth Partial Property Settlement

and Separation Agreement and Modification Agreement," signed by Lester on April 16, 2008

and by Beck on April 23, 2008, and filed in their divorce case, City of Lynchburg Circuit Court

Case No. CL06000448.

99.     Thus, under Va. Code §§ 13.1-1049.1 and 13.1-1049.2, Beck and Lester are personally

liable to CVLR in equal fifty percent shares, not to exceed the total value of the assets that were distributed to them, for the damages sustained by CVLR as a result of S & R Farm's breach of contract.

100.    Accordingly, Ralph Beck and Shana Lester are liable to CVLR for CVLR's loss of the benefit of the bargain to buy the riding center property in an amount equal to Four Hundred Seventy Five Thousand Dollars ($475,000.00) and for CVLR's loss of the expectancy to operate the riding center in an amount equal to One Million Dollars ($1,000,000.00), plus interest from November 20, 2007.

### I.  THE RELATIONSHIP BETWEEN WYNNE'S CONDUCT TOWARD CVLR, RIVERS, FOSTER, AND MARSH.

101.    The money Wynne obtained through Rivermont and 1650 Partners was intermingled and the proceeds of Wynne's transactions with one victim were used by Wynne to finance transactions with the other victims.

102.    For example, on July 23, 2008, Old Dominion National Bank issued Cashier's Check No. 1438 to Terrance White for payment of a false invoice submitted by Wynne (who represented himself by forgery as contractor Glen White) for work done to repair the damaged barn at the riding center property.  White endorsed the check "for deposit only" to "Rivermont Banking #6401620," but deposited the check into Wynne's personal checking account at Bank of the James numbered 6401620.  With the funds from the insurance proceeds (intermingled with other funds from Rivermont and 1650 Partners), Wynne then paid Bank of the James Account 6406120 Check No. 966 to Peter Sackett in the amount of $16,000.00 to pay the deposit on Wynne's purchase of Karen Foster's property at the foreclosure sale Sackett conducted on September 25, 2008.  Wynne wrote "2232 Ridgewood," the address of Foster's property, on the memo line of the check.

23

103.    Another example is that on April 20, 2007 Wynne issued to Counts Realty Group a starter check on First Bank & Trust Co. (Abingdon, Virginia) Account No. 70002555 in the amount of $20,000.00 to pay the deposit on the riding center property which CVLR had a contract to purchase from S & R Farm.  The check, which has "The Rivermont Banking Company" typed out, is an account which contains proceeds of the March 30, 2007 Wachovia loan obtained by Vicki Marsh.

104.    A third example is that Crystal Rivers was shown, by Special Agent James E. Vaughan the Virginia State Police, records of deposits into the Bank of the James Account No. 1120246 entitled "Southgate Leigh Wynne Trust" that matched the amounts of cashier's checks that CVLR paid to ODNB for what she thought was her mortgage payment to ODNB.  Wynne paid Vicki March's Wachovia note from the same "Southgate Leigh Wynne Trust" account, as established, for example, by Check 904, dated May 28, 2007, in the amount of $3493.95. Although Check 904 was paid by Wynne to Wachovia prior to CLVR's commencement of payments that were deposited into the "Southgate Leigh Wynne Trust" account, Wynne stated separately in a response to a complaint Marsh filed with Wells Fargo that he paid the Marsh mortgage from the "Southgate Leigh Wynne Trust" account through August 14, 2008.  Thus, the Marsh mortgage was paid with funds from CVLR's putative mortgage payments.

105.    Wynne used the equity in real estate that he obtained from his victims to increase the appearance of his net worth so that he could obtain new financing.

106.    For example, in April 2009, 1650 Partners applied to ODNB to renew the financing of the riding center property.  In the loan presentation made by Charles Darnell as "Loan Officer" on April 23, 2009, Darnell stated that Wynne owned "a vacation home in Pawley's Island, SC valued at $1,300K with a $500K mortgage (owns 50%) . . . ."

24

107.    In attempt to obtain financing from ODNB for a proposed "Ivy Lake" Waterfront Condominium Project in Forest, Virginia, Wynne submitted a personal financial statement "As of December 31, 2009," in which he listed as an asset: "1/2 Residential Property, 392 Myrtle Ave Pawleys Island South Carolina . . . I own 1/2 but not on any debt so value represents my equity interest."  Wynne also listed "2232 Ridgewood," Karen Foster's property, as an asset, with a market value of $200,000.00 and a loan balance of zero, even though Wynne and Sackett had not yet paid off Bank of America's first mortgage on the property.

## CLAIMS FOR RELIEF

### COUNT ONE

### CIVIL RACKETEERING AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c), § 1964 (AGAINST JOHN WYNNE, 1650 PARTNERS L.L.C., AND RIVERMONT CONSULTANTS, INC.)

A.    INTRODUCTION.

108.    The plaintiff alleges that Wynne violated 18 U.S.C. § 1962(c).

109.    Wynne has pursued a scheme, as defined by 18 U.S.C. Sec. 1961, by committing a pattern of racketeering acts himself, and using other entities, including legitimate enterprises Rivermont, 1650 Partners, and the Southgate Leigh Wynne Trust, to commit racketeering acts to achieve his personal economic enrichment.

110.    Wynn has operated Rivermont, 1650 Partners, and the Southgate Leigh Wynne Trust, enterprises that he controls, by using those enterprises to commit racketeering acts and prey upon women in financial distress who relied upon his putative expertise as a banker.

111.    Wynne, Rivermont, 1650 Partners, and the Southgate Leigh Wynne Trust were engaged in interstate commerce because their actions involved banking and insurance in interstate commerce.

112.   The object of the racketeering enterprise is to obtain money and property by illegal means for Wynne's personal economic enrichment.

113.   The racketeering enterprise has continued since 2006.  Wynne committed the predicate acts described below in pursuit of his scheme to obtain personal economic enrichment.  Upon information and belief, Wynne has committed other predicate acts that the plaintiff expects to be able to prove after obtaining the full banking records of Wynne, Rivermont, 1650 Partners, and the Southgate Leigh Wynne Trust during discovery.  Upon information and belief, the plaintiff will then be able to prove that Wynne used the money obtained from victims to pursue his scheme to commit acts, including other racketeering acts, which had the purpose of obtaining money and property from other victims.

114.   This count describes how Wynne pursued his scheme by committing predicate acts that injured CVLR directly (Predicate Acts 1-3), predicate acts that injured CVLR indirectly by advancing Wynne's scheme (Predicate Acts 4-6), and other acts that, although not criminal acts prohibited by federal law, advanced Wynne's scheme.  All of the acts described herein are related to each other and are continuing in their efforts.

B.      PREDICATE ACTS.

### PREDICATE ACT 1:  BANK FRAUD IN OBTAINING FUNDS FOR PURCHASE OF RIDING CENTER PROPERTY

#### A. SUMMARY OF THE BANK FRAUD CLAIM.

SUMMARY OF THE BANK FRAUD CLAIM:  Wynne told ODNB that 1650 Partners had a contract to purchase the property, even though Wynne knew that CVLR had a contract to purchase the property.  ODNB relied on Wynne's statement and funded 1650 Partners' purchase of the property.  He thereby caused ODNB to fund 1650 Partners' purchase of the riding center property even though 1650 Partners did not have a contract to purchase the property.

#### B.  FACTUAL DESCRIPTION OF WYNNE'S CONDUCT.

115.   The allegations of paragraphs 10 through 27 are adopted herein.

26

C.  LEGAL CLAIMS REGARDING THIS PREDICATE ACT.

116.   <u>THE ELEMENTS OF BANK FRAUD:</u>  Wynne, acting through 1650 Partners,

committed all of the acts that constitute the elements of bank fraud, as set forth in 11 U.S.C. §

1344.  Wynne defrauded a financial institution (ODNB) by:

(a)   telling Darnell that he had a contract to purchase the riding center property for

$475,000.00, when neither he personally nor 1650 Partners had a contract to purchase the

property;

(b)   maintaining the false pretense that he had a contract from on or about October 12,

2007 through the November 20, 2007 closing, when he signed bank documents as "borrower"

and "purchaser," knowing that the contract to purchase the property was in the name of "CVLR

Performance Horses"; and

(c)   obtaining from ODNB $475,000.00 in loan proceeds for the benefit of 1650

Partners, an enterprise that he alone controlled.

117.   <u>WYNNE'S MOTIVE:</u>  Wynne, acting through 1650 Partners, gained from the fraud in

the following ways:

(a)   by presenting false pretenses to ODNB, he obtained financing from ODNB to

purchase the property when he did not have a contract to purchase the property;

(b)   by presenting false pretenses to CVLR, he induced CVLR to perform all of the

duties that he would otherwise have been responsible to perform if he owned the property and to

prey upon Rivers in other ways, as described in Predicate Act 2 and 4 below.  CVLR made

Wynne's mortgage payments to ODNB because CVLR thought it was obligated under the

mortgage to pay ODNB, and CVLR maintained casualty insurance on the property;

27

(c)      Wynne's scheme benefitted him more than if CVLR was a lessee of 1650 Partners because, in the absence of a lease, CVLR was on the property at Wynne's sufferance and he could eject it at any time, which he later did when he became tired of Rivers' complaint that he had swindled her.

118.    <u>HOW CVLR WAS HARMED:</u>  CVLR was harmed in the following ways:

(a)      CVLR lost the benefit of its contract to purchase the property because the bank funded the purchase of the property by Wynne, who did not have a contract to purchase the property;

(b)      CVLR made mortgage payments and insurance premium payments to pay Wynne's mortgage;

(c)      CVLR invested its money to establish a riding center based on its belief, fraudulently induced by Wynne's false pretenses, that it had an ownership interest in the riding center property.  CVLR lost all of its investment when CVLR was ejected from the property by Wynne.

119.    <u>WHO, WHAT, WHEN WHERE, AND HOW OF THE BANK FRAUD:</u> The who, what, when, where, and how of the bank fraud as alleged herein is as follows:

(a)      Who:  Wynne, acting through 1650 Partners;

(b)      What:  Wynne told Darnell that he had a contract to purchase the riding center property.  Wynne presented false pretenses to ODNB that <u>he</u> had a contract to purchase the riding center property for $475,000.00, when he knew that the bank thought that he had a contract to purchase the property.  Wynne knew that the contract to purchase the property was in the name of "CVLR Performance Horses," but did not reveal that material fact to ODNB;

(c)     When:  Wynne told Darnell on or about October 12, 2007 that he had a contract to purchase the riding center property.  From then until November 20, 2007, when he signed the loan documents as the purchaser of the riding center property, Wynne presented false pretenses to ODNB that he had a contract to purchase the riding center property for $475,000.00.

(d)     Where:  Wynne told Darnell that he had a contract to purchase the riding center property at the office of ODNB in North Garden, Virginia.  From then until November 2, 2007, Wynne presented false pretenses to ODNB at both ODNB's office and over the telephone from his home at 1688 Holcomb Rock Road, Lynchburg, Virginia, that he had a contract to purchase the riding center property for $475,000.00;

(e)     How:  Wynne defrauded ODNB by a false representation and by false pretenses, inducing ODNB into loaning money to 1650 Partners to finance its purchase of the riding center property, even though 1650 Partners did not have a contract to purchase the riding center property.

120.    HOW THIS IS A PREDICATE ACT UNDER 18 U.S.C. § 19862(c):  Wynne, who controlled 1650 Partners, used it to commit this act of bank fraud, with the purpose of obtaining economic gain, and thus injuring CVLR, making 1650 Partners a corrupt organization.

## PREDICATE ACT 2:  INSURANCE FRAUD IN OBTAINING

## PROCEEDS OF CVLR'S INSURANCE POLICY

### A.  SUMMARY OF THE PREDICATE ACT.

SUMMARY OF THE WIRE FRAUD AND BANK FRAUD CLAIM:  Wynne, acting through Rivermont, committed wire fraud when he falsely represented to ODNB through faxes (forged by Wynne in the name of Class A contractor Glen White) on May 15, 2008, June 3, 2008, June 24, 2008, July 22, 2008, and September 5, 2008 that he was due money paid to ODNB and CVLR by American Bankers Insurance Company.  Wynne falsely claimed that he had performed work to repair damage to the riding center, which was ODNB's collateral for the riding center loan, when he had not done that work.  Wynne

obtained $35,190.59 from ODNB as a direct result of the presentation of the false and forged invoices.

### B.  FACTUAL DESCRIPTION OF WYNNE'S CONDUCT.

121.    The allegations of paragraphs 28 through 37 are adopted herein.

### C.  LEGAL CLAIM REGARDING THIS PREDICATE ACT.

122.    THE ELEMENTS OF WIRE FRAUD:  Wynne, acting through Rivermont, committed all the acts that constitute the elements of wire fraud, as set forth in 18 U.S.C. § 1343.  He transmitted false and fraudulent writings by wire for the purpose of obtaining money and property when he:

(a)    faxed to American Bankers the forged letter on September 18, 2008, representing himself as Glen White (a Class A contractor) and requesting payment of the insurance proceeds to himself;

(b)    faxed to American Bankers false invoices on September 18, 2008, claiming payment for work which had not been done; and

(c)    obtained from ODNB $35,190.59 which he paid to Rivermont.

123.    WYNNE'S MOTIVE:  Wynne, acting through 1650 Partners, gained from the wire fraud by obtaining personal possession of the insurance proceeds that American Bankers paid for the repair of the facilities that CVLR needed to operate its business and to which CVLR was entitled as the entity that owned the insurance policy and that had paid the premiums for the policy.

124.    HOW CVLR WAS HARMED:  CVLR was harmed because it lost the benefit of $35,190.59 that American Bankers paid to repair the barn after paying the premiums for the American Bankers policy.

125.   THE WHO, WHAT, WHEN, WHERE, AND HOW OF THE WIRE FRAUD AND THE

BANK FRAUD.  The who, what, when, where, and how of the wire fraud as alleged herein is as

follows:

(a)     Who:  Wynne, acting through Rivermont;

(b)     What:  Wynne, by submitting to American Bankers the forged letters requesting

payment to himself, by submitting false invoices for work that was not done, and by directing his

employee Terrance White to endorse the checks for deposit to Rivermont (which he solely

owned), obtained $35,190.59 in insurance proceeds that belonged to CVLR;

(c)     When:  The forged letter was submitted by fax on September 18, 2008, and false

invoices were submitted on July 22, 2008 and September 5, 2008;

(d)     Where:  The letters and invoices were prepared and faxed from Wynne's property

at 1688 Holcomb Rock Road, Lynchburg, Virginia;

(e)     How:  The forged letters and false invoices were made by fax to American

Bankers from Glen White's office in Lynchburg, and insurance money was paid to Terrance

White (Wynne's employee) who deposited the funds to Rivermont's account.

126.   HOW THIS IS A PREDICATE ACT UNDER 18 U.S.C. § 1962(c):  Wynne, who

controlled Rivermont, operated Rivermont as a corrupt organization, obtaining money to which it

was not entitled through this act of wire fraud, with the purpose of obtaining economic gain, and

by injuring CVLR.

### PREDICATE ACT 3:  WIRE FRAUD AND BANK FRAUD IN OBTAINING MONEY FOR PURCHASE OF TRUCK OWNED BY CRYSTAL RIVERS

#### A.  SUMMARY OF THE PREDICATE ACT.

SUMMARY OF THE WIRE FRAUD AND BANK FRAUD CLAIM:  Wynne,
acting through Rivermont as a corrupt organization, committed wire fraud when
he falsely represented through faxes to BB&T on September 26, 2007 and

31

September 27, 2007 that the odometer reading on the 2006 F650 truck was 3936 miles and that the "Balance Due on Delivery" for the 2006 F650 truck was $104,215.34. The balance due was actually $60,508.86. By making those false representations, Rivermont also committed bank fraud because Rivermont obtained from BB&T $107,341.80. Wynne's fraud resulted in damage to CVLR and Rivers because Rivers lost title to the Ford F650 truck without her knowledge and consent and CVLR became obligated without its knowledge and consent to pay money to Wynne that CVLR would not have been obligated to pay if Wynne had not defrauded BB&T.

## B.  FACTUAL DESCRIPTION OF WYNNE'S CONDUCT.

127.   The allegations of paragraphs 38-60 are adopted herein.

## C.  LEGAL CLAIMS REGARDING THIS PREDICATE ACT.

128.   THE ELEMENTS OF WIRE FRAUD:  Wynne, acting through Rivermont, committed all of the acts that constitute the elements of wire fraud, as set forth in 18 U.S.C. § 1343.  He transmitted false and fraudulent writings by wire for the purpose of obtaining money and property when he:

(a)   faxed to BB&T a copy of a "9/27/2007" Virginia Buyers Order (signed by Wynne as "Pres/CEO" of "The Rivermont Banking Co") showing that the balance due to Battlefield Ford was the incorrect amount of $104,215.34, rather than the correct amount of $60,508.86;

(b)   faxed to BB&T a copy of a "9/27/2007" Virginia Buyers Order (signed by Wynne as "Pres/CEO" of "The Rivermont Banking Co") falsely stating that the odometer reading on September 27, 2007 was 3936 miles when he knew that the odometer reading on the truck was much higher;

(c)   obtaining from BB&T $107,341 in loan proceeds, which allowed him to obtain an immediate refund of $43,673.27 from Battlefield Ford.

32

129.   <u>THE ELEMENTS OF BANK FRAUD:</u>  Wynne, acting through Rivermont, committed all of the acts that constitute the elements of bank fraud, as set forth in 18 U.S.C. § 1344.  He defrauded a financial institution (BB&T) by:

(a)   falsely representing, by faxing a copy of a "9/27/2007" Virginia Buyers Order (signed by Wynne as "Pres/CEO" of "The Rivermont Banking Co") showing that the balance due to Battlefield Ford was $104,215.34, rather than the correct amount of $60,508.86;

(b)   falsely representing to BB&T that the odometer reading on September 27, 2007 was 3936 miles when he knew that the odometer reading on the truck was much higher (the plaintiff knows this because the odometer reading was 3936 miles when Rivers picked up the truck on May 8, 2007 and Rivers had been driving the truck since that time); and

(c)   obtaining from BB&T $107,341 in loan proceeds, which allowed him to obtain an immediate refund of $43,673.27 from Battlefield Ford.

130.   <u>WYNNE'S MOTIVE:</u>  Wynne, acting through Rivermont, gained from the fraud by:

(a)   improving his position from having $43,673.27 in the deal to having paid nothing for the truck.  He was immediately paid back by Battlefield Ford from the BB&T loan proceeds the $43,673.27 which he had previously paid as a down payment and received as trade-in credit;

(b)   shifting the risk of loss for the collateral (the truck) entirely to BB&T and Rivers while still having ownership of the vehicle.  The insurance was paid entirely by Rivers, who thought she owned the vehicle because she was given a temporary certificate of title in her name on May 8 and who did not know that Wynne had changed the title of the truck to Rivermont's name; and

(c)   obtaining an additional $11,458.80 in interest payments from CVLR and still having ownership of the vehicle.  Under the "Lease, Loan, and Contract to Buy Agreement"

33

drafted by Wynne, CVLR was required to pay the seventy-two $1976.00 monthly payments

BB&T on Wynne's loan.  In addition, the "Lease, Loan, and Contract to Buy Agreement"

drafted by Wynne required CVLR and Rivers to pay Rivermont interest of 8½% per annum on

the $104,315.34 that Rivermont and Wynne borrowed from BB&T.[2]  Cumulatively, the interest

obligation that CVLR and Rivers incurred (without CVLR's and Rivers' knowledge) was

19.34% per annum (10.84% to BB&T and an additional 8.5% to Rivermont and Wynne), which

made CVLR's and Rivers' monthly obligation to Wynne $2714.90.  If Wynne had financed

through BB&T only $60,508.86, CVLR and Rivers would have only been obligated to Wynne

$2525.75 each month ($1147.09 to cover the BB&T payment plus $1378.66 to Wynne under the

"Lease, Loan, and Contract to Buy Agreement").  Thus, financing the entire deal through BB&T

allowed Wynne to claim an additional $11,458.80 in interest from CVLR.  Moreover, under the

agreement, CVLR would not have been entitled to claim title to the truck.  Rivermont would still

have owned the truck and would have been entirely within its right to take it back from CVLR at

any time unless CVLR paid an additional "premium" described in the agreement drafted by

Wynne.

131.   <u>HOW CVLR WAS HARMED:</u>  CVLR was harmed by Wynne's scheme in the following

ways:

(a)     CVLR incurred an additional $11,458.80 in interest payments from CVLR and

lost any ownership interest in the vehicle; and

(b)     Wynne duped Rivers into believing that she owned the truck, inducing her to

cause CVLR to make payments on Rivermont's loan, maintain insurance on the truck, and make

---

[2]     There is a $100.00 difference between the amount borrowed by Rivermont ($104,315.34)
and the sales price stated on the Virginia Buyers Order that Wynne and Rivermont submitted to
BB&T ($104,215.34).

interest payments to Wynne, while Wynne actually only allowed Rivers to use the truck so long as she paid Rivermont's note and paid a premium to Rivermont under the "Lease, Loan, and Contract to Buy Agreement."

132.   WHO, WHAT, WHEN, WHERE, AND HOW OF THE WIRE FRAUD AND BANK FRAUD:  The who, what, when, where, and how of the wire fraud and bank fraud as alleged herein is as follows:

(a)    Who:  Wynne, acting through Rivermont;

(b)    What:  Wynne falsely represented to BB&T by fax that the odometer reading on the 2006 F650 truck was 3936 miles on September 27, 2007 and he falsely represented to BB&T by fax that the "Balance Due on Delivery" for the 2006 F650 truck was $104,215.34, when the balance due was actually $60,508.86.  By making these false representations, Rivermont obtained financing from BB&T in the total amount of $107,341.80 and received $43,673.27 from Battlefield Ford;

(c)    When:  The false representations were made on September 26 and September 27, 2007.  Wynne obtained the funds from BB&T as a result of false representations made by fax on September 27, 2007;

(d)    Where:  The false representations were made to BB&T by Wynne from 1688 Holcomb Rock Road, Lynchburg, Virginia on September 26, 2007 (the representations were made by fax and, upon information and belief, the fax machine is at Wynne's home, but the owner of the fax machine is illegible on the faxes in the plaintiff's possession) and from Battlefield Ford, 8980 Mathis Avenue, Manassas, Virginia on September 27, 2007;

(e)    How:  The false representations were made by fax to BB&T from Wynne's premises at 1688 Holcomb Rock Road in Lynchburg and from Battlefield Ford.

133.   <u>HOW THIS IS A PREDICATE ACT UNDER 18 U.S.C. § 1962(c)</u>:  Wynne, who

controlled Rivermont, operated Rivermont as a corrupt organization, using it to commit this act

of wire and bank fraud, with the purpose of obtaining economic gain, and by injuring CVLR.

### PREDICATE ACT 4:  WIRE FRAUD IN OBTAINING STATE FARM AUTO INSURANCE POLICY BENEFITS

### A.  SUMMARY OF THE WIRE FRAUD CLAIM.

<u>SUMMARY OF THE WIRE FRAUD CLAIM</u>:  On February 1, 2007, Wynne telephoned Margie Callahan, without Rivers' knowledge or consent, and told Callahan that Rivers had authorized him to add Rivermont's 1999 Chevrolet Tahoe to Rivers' auto insurance policy with State Farm Insurance Company.  On October 9, 2007, Wynne's teenage son wrecked the vehicle and Wynne filed a claim on Rivers' policy.  A representative of State Farm asked Wynne to provide proof that he owned Rivermont and Wynne sent to State Farm a forged "2007 Annual Report" of Rivermont.   Wynne obtained $10,630.00 in State Farm insurance proceeds as a result of the fraudulent claim, as recorded in State Farm Activity Log.

### B.  FACTUAL DESCRIPTION OF WYNNE'S CONDUCT.

134.   The allegations of paragraphs 61 through 69 are adopted herein.

### C.  LEGAL CLAIM REGARDING THIS PREDICATE ACT.

135.   <u>THE ELEMENTS OF WIRE FRAUD</u>:  Wynne, acting through Rivermont, committed all

the acts that constitute the elements of wire fraud, as set forth in 18 U.S.C. § 1343.  He

transmitted false and fraudulent writings by wire for the purpose of obtaining money and

property when he:

(a)      falsely told Margie Callahan, during their telephone conversation of February 1,

2007, that Rivers authorized him to add Rivermont's 1999 Chevrolet Tahoe to Rivers' auto

insurance policy;

(b)      faxed the forged Rivermont "2007 Annual Report" to State Farm on October 26,

2007; and

(c)      obtained $10,630.00 in State Farm insurance proceeds as a result of the fraudulent claim.

136.  <u>WYNNE'S MOTIVE</u>:  Wynne gained from the fraud by obtaining auto insurance coverage that he could not otherwise obtain and by obtaining $10,630.00 in State Farm insurance proceeds as a result of the fraudulent claim.

137.  <u>WHO, WHAT, WHEN, WHERE, AND HOW OF THE WIRE FRAUD</u>.  The who, what, when, where, and how of the wire fraud as alleged herein is as follows:

(a)      Who:  Wynne, acting on behalf of Rivermont;

(b)      What:  Wynne falsely told Margie Callahan over the telephone that Rivers authorized him to add Rivermont's 1999 Chevrolet Tahoe to Rivers' auto insurance policy. Wynne faxed the forged "2007 Annual Report" of Rivermont to State Farm and thereby obtained $10,630.00 in State Farm insurance proceeds as a result of the fraudulent claim;

(c)      When:  Wynne's telephone conversation with Margie Callahan in which he said that Rivers authorized him to add Rivermont's 1999 Chevrolet Tahoe to Rivers' auto insurance policy was on February 1, 2007.  Wynne faxed the forged "2007 Annual Report" on October 26, 2007;

(d)      Where:  The telephone call and the fax were both made from Wynne's home at 1688 Holcomb Rock Road, Lynchburg, Virginia;

(e)      How:  The false representation to Callahan on February 1, 2007 was made by telephone and the transmission of the forged "2007 Annual Report" to Sandy at State Farm was made by fax.

138.     HOW THIS IS A PREDICATE ACT UNDER 18 U.S.C. § 1962(c): Wynne, who

controlled Rivermont, operated Rivermont as a corrupt organization, using it to obtain the benefit

of insurance coverage and benefits from State Farm by wire fraud.

**PREDICATE ACT 5:  BANK FRAUD IN PRESENTING FORGED CHECK**

### A.  SUMMARY OF THE BANK FRAUD CLAIM.

SUMMARY OF THE BANK FRAUD CLAIM:  Wynne forged Crystal Rivers'
signature on 1650 Partners L.L.C. Check No. 1020 and obtained for himself
$3000.00.

### B.  FACTUAL DESCRIPTION OF WYNNE'S CONDUCT.

139.    The allegation of paragraph 70 is adopted herein.

### C.  LEGAL CLAIMS REGARDING THIS PREDICATE ACT.

140.    THE ELEMENTS OF BANK FRAUD:  Wynne, acting through 1650 Partners,

committed all of the acts that constitute the elements of bank fraud as set forth in 18. U.S. C. §

1344.  He defrauded a financial institution (ODNB) by:

        (a)     falsely representing, by presenting Check No. 1020 on which he had signed

Crystal Rivers' name, that Rivers had signed the check; and

        (b)     obtaining $3000.00 for himself from ODNB.

141.    WYNNE'S MOTIVE:  Wynne, acting through 1650 Partners, enriched himself in the

amount of $3000.00.

142.    WHO, WHAT, WHEN, WHERE, AND HOW OF THE BANK FRAUD: The who, what,

when, where, and how of the bank fraud as alleged herein is as follows:

        (a)     Who:  Wynne, acting as a member of 1650 Partners;

        (b)     What:  Wynne falsely represented, by presenting Check No. 1020 on which he

had signed Crystal Rivers' name, that Rivers had signed the check and he thereby obtained

$3000.00 for himself from ODNB;

38

(c)      When:  October 1, 2008;

(d)      Where:  Wynne presented the check for deposit to ODNB, North Garden,

Virginia;

(e)      How:  Wynne obtained the money by presenting a forged check for payment.

143.    HOW THIS IS A PREDICATE ACT UNDER 18 U.S.C. § 1962(a):  Wynne, who

controlled the checkbook of 1650 Partners, operated 1650 as a corrupt organization for his

personal benefit, using it to commit bank fraud, with the purpose of obtaining economic gain.

**PREDICATE ACT 6:  BANK FRAUD IN FORECLOSURE OF
KAREN FOSTER'S HOME**

A.  SUMMARY OF THE BANK FRAUD CLAIM.

SUMMARY OF THE BANK FRAUD CLAIM:  On September 25, 2008, Peter
Sackett, at the direction of Wynne, conducted a foreclosure sale of Karen Foster's
home based upon Wynne's false pretense to Sackett that Foster had failed to pay
upon demand a note made by her in favor of Wynne on August 23, 2006.  The
note was secured by a deed of trust dated August 23, 2006.  Sackett, with
Wynne's knowledge, failed to pay the first deed of trust, held by Bank of
America.  Wynne, knowing that the Bank of America deed of trust had not been
paid, falsely claimed in a financial statement to ODNB "as of December 31,
2009" that he owned the property, free and clear.  Wynne submitted the false
financial statement to ODNB to support his application to renew the loan on the
riding center property.

B.  FACTUAL DESCRIPTION OF WYNNE'S CONDUCT.

144.    The allegations of paragraph 71 through 80 are adopted herein.

## C.  LEGAL CLAIMS REGARDING THIS PREDICATE ACT.

145.   THE ELEMENTS OF BANK FRAUD:  Wynne, acting through 1650 Partners,

committed all of the acts that constitute the elements of bank fraud, as set forth in 18 U.S.C. §

1344.  Wynne defrauded a financial institution (ODNB) by:

(a)   falsely stating on April 23, 2009 in a statement entitled "Financial Statement" that

there was no mortgage on 2232 Ridgewood Drive property when he knew that Bank of America

held a first deed of trust on the property; and

(b)   obtaining from ODNB a renewal of 1650 Partners' $475,000.00 loan to purchase

the riding center property and renewal of a $25,000.00 working capital loan.

146.   WYNNE'S MOTIVE:  Wynne, acting through 1650 Partners, gained from the fraud in

the following ways:

(a)   he represented his financial condition as better than it actually was.  Wynne's

statement that there was no mortgage on the 2232 Ridgewood Drive property was false; and

(b)   he obtained credit from ODNB in the amount of $500,000.00.

147.   WHO, WHAT, WHEN, WHERE, AND HOW OF THE BANK FRAUD: The who, what,

when, where, and how of the bank fraud as alleged herein is as follows:

(a)   Who:  Wynne, acting to renew 1650 Partners' notes;

(b)   What:  On February 5, 2010, Wynne submitted to ODNB a false financial

statement that stated there was no mortgage on 2232 Ridgewood Drive;

(c)   When:  Wynne submitted the financial statement to ODNB on April 23, 2009;

(d)   Where:  Wynne submitted the financial statement to Darnell at the office of

ODNB, North Garden, Virginia;

(e)     How:  Wynne committed bank fraud by submitting a false financial statement to ODNB, thereby obtaining renewal of his credit at ODNB in the amount of $500,000.00.

148.    <u>HOW THIS IS A PREDICATE ACT UNDER 18 U.S.C. § 1962(c)</u>:  Wynne, who controlled 1650 Partners, operated 1650 Partners as a corrupt organization, using it to commit this act of bank fraud, with the purpose of obtaining economic gain.

C.      <u>THE PREDICATE ACTS ARE RELATED IN A LARGER AND CONTINUING SCHEME FOR THE PURPOSE OF WYNNE'S ECONOMIC ENRICHMENT.</u>

1.      <u>WYNNE'S ACTIONS AGAINST CVLR, RIVERS, MARSH, AND FOSTER WERE ALL RELATED TO A LARGER SCHEME FOR HIS ECONOMIC GAIN.</u>

(a)     <u>WYNNE USED MONEY FROM ONE PREDICATE ACT TO FUND OTHER PREDICATE ACTS.</u>

149.    The money Wynne obtained through Rivermont and 1650 Partners was intermingled and the proceeds of Wynne's transactions with one victim were used by Wynne to finance transactions with the other victims.

150.    For example, on July 23, 2008, Old Dominion National Bank issued Cashier's Check No. 1438 to Terrance White for payment of a false invoice submitted by Wynne (who represented himself by forgery as contractor Glen White) for work done to repair the damaged barn at the riding center property.  White endorsed the check "for deposit only" to "Rivermont Banking #6401620," but deposited the check into Wynne's personal checking account at Bank of the James numbered 6401620.  With the funds from the insurance proceeds (intermingled with other funds from Rivermont and 1650 Partners), Wynne then paid Bank of the James Account 6406120 Check No. 966 to Peter Sackett in the amount of $16,000.00 to pay the deposit on Wynne's purchase of Karen Foster's property at the foreclosure sale Sackett conducted on

September 25, 2008.  Wynne wrote "2232 Ridgewood," the address of Foster's property, on the memo line of the check.

151.    Another example is that on April 20, 2007 Wynne issued to Counts Realty Group a starter check on First Bank & Trust Co. (Abingdon, Virginia) Account No. 70002555 in the amount of $20,000.00 to pay the deposit on the riding center property which CVLR had a contract to purchase from S & R Farm.  The check, which has "The Rivermont Banking Company" typed out, is an account which contains proceeds of the March 30, 2007 Wachovia loan obtained by Vicki Marsh.

152.    A third example is that  deposits into the Bank of the James Account No. 1120246 entitled "Southgate Leigh Wynne Trust"  matched the amounts of cashier's checks that CVLR paid to ODNB as mortgage payments.   According to Crystal Rivers, she was shown the records of the deposits by Special Agent James E. Vaughan of the Virginia State Police.  Wynne paid Vicki March's Wachovia note from the same "Southgate Leigh Wynne Trust" account, as established, for example, by Check 904, dated May 28, 2007, in the amount of $3493.95.  Although Check 904 was paid by Wynne to Wachovia prior to CLVR's commencement of payments that were deposited into the "Southgate Leigh Wynne Trust" account, Wynne stated separately in a response to a complaint Marsh filed with Wells Fargo that he paid the Marsh mortgage from the "Southgate Leigh Wynne Trust" account through August 14, 2008.  Thus, the Marsh mortgage was paid with funds from CVLR's putative mortgage payments.

      (b)     WYNNE USED THE EQUITY GAINED IN ONE
                   PREDICATE ACT TO COMMIT OTHER
                   PREDICATE ACTS.

153.    Wynne used the equity in real estate that he obtained from his victims to increase the appearance of his net worth so that he could obtain new financing.

42

154.    For example, in April 2009, 1650 Partners applied to ODNB to renew the financing of

the riding center property.  In the loan presentation made by Charles Darnell as "Loan Officer"

on April 23, 2009, Darnell stated that Wynne owned "a vacation home in Pawley's Island, SC

valued at $1,300K with a $500K mortgage (owns 50%) . . . ."

155.    In an attempt to obtain financing from ODNB for a proposed "Ivy Lake" Waterfront

Condominium Project in Forest, Virginia, Wynne submitted a personal financial statement "As

of December 31, 2009," in which he listed as an asset: "1/2 Residential Property, 392 Myrtle

Ave Pawleys Island South Carolina . . . I own 1/2 but not on any debt so value represents my

equity interest."  Wynne also listed "2232 Ridgewood," Karen Foster's property, as an asset,

with a market value of $200,000.00 and a loan balance of zero, even though Wynne and Sackett

had not yet paid off Bank of America's first mortgage on the property.

        2.      WYNNE'S SCHEME IS CONTINUOUS.

156.    Wynne's scheme has continued since 2006.  The predicate acts were committed over a

period of more than three years, but the consequences of the scheme have not yet been

completed and are continuing:

        (a)     CVLR remains without the benefit of the bargain of its contract to purchase the

riding center property, an injury which is a direct result of Wynne's false representations to

ODNB that 1650 Partners had a contract to purchase the riding center property;

        (b)     Karen Foster remains without legal title to her home at 2232 Ridgewood Drive,

Lynchburg.  Wynne obtained title to Foster's home by paying Sackett the $16,000.00 down

payment from money he obtained from CVLR's insurance proceeds;

        (c)     Vicki Marsh remains under the threat that Wachovia will foreclose on her home

which is a direct result of Wynne taking the proceeds of Marsh's loan from Wachovia and

43

depositing those funds in the Southgate Leigh Wynne Trust account, into which he had deposited CVLR's payments (he overcharged CVLR for mortgage, leaving him with net surplus) on 1650 Partners' mortgage and from which he paid the Bank of America first deed of trust on Foster's home;

(d)     Rivermont continues to advertise itself on the internet as a bank, providing "mortgage loans, construction loans, and reverse mortgages."

D.     SUMMARY.

157.    Wynne has violated 18 U.S.C. § 1962(c).  He committed all of the elements of the offense:

(1)     An enterprise existed.  The enterprises were Rivermont, 1650 Partners, and the Southgate Leigh Wynne Trust;

(2)     The enterprise was engaged in, or its activities affected, interstate commerce. Banking and insurance are businesses in and affecting interstate commerce;

(3)     Wynne controlled the enterprises;

(4)     Wynne conducted the business of the enterprises through committing multiple racketeering acts.

158.    Wynne targeted women in financial distress, who thought he was a banker and who believed he was helping them.  He enriched himself at their expense, a scheme that included the commission of racketeering acts over a period of years that constituted a pattern of racketeering activity.

159.    CVLR was directly damaged by racketeering acts by losing the benefit of its contract to purchase the riding center property, by losing the benefits of its American Bankers casualty

insurance policy, and by losing title to the Ford F650 truck even though it made the payments and insured the vehicle.

COUNT TWO

(BREACH OF CONTRACT AGAINST S & R FARM, L.L.C.
RALPH BECK, AND SHANA LESTER)

160.    The allegations of paragraphs 91 through 99 are adopted herein.

161.    S & R Farm entered into the October 28, 2007 contract, promising to sell the riding center property to "CVLR Performance Horses or Assignee."

162.    On November 15, 2007, S & R Farm's members, defendants Ralph Beck and Shana Lester, executed a deed conveying the riding center property to 1650 Partners.  The deed was dated November 13, 2007, but was signed on November 15, 2007.  Herein, the deed will be referred to as the "November 13, 2007 deed" because November 13, 2007 is the date on the face of the deed.

163.    CVLR never assigned its contractual right to purchase the riding center.

(a)  The contract to purchase the riding center property is covered by the Statute of Frauds (under English law and the Virginia reception statutes (Va. Code § 1-200 and Va. Code § 1-201). and Va. Code § 11-2) and there has never been a writing that constituted an assignment of CVLR's contractual right to purchase the riding center;

(b)  CVLR did nothing to manifest an intention to transfer its right to purchase the riding center property prior to the execution of the November 13, 2007 deed conveying the property to 1650 Partners;

(c)  CVLR's conduct did not manifest an intention to transfer its right to purchase the riding center property prior to the execution of the November 13, 2007 deed conveying the property to 1650 Partners.  Teresa Polinek, the real estate agent who represented both seller S &

45

R Farm and purchaser CVLR, and the person who drafted the October 28, 2011 contract, has

stated in writing to the plaintiff:

> I was under the assumption that CVLR Performances [sic], Crystal Rivers, was
> purchasing the barn and that John Wynn [sic] was backing the financing. . . . At no time
> was it mentioned that anyone other than CVLR Performances, Crystal Rivers, would be
> purchasing the said property.  I was asked to put the purchaser as CVLR Performances or
> Assignee.  I was never contacted to change the Assignee from CVLR Performances to
> another party.

164.   S & R Farm sold the property to 1650 Partners, not to CVLR, which was a breach of

S & R Farm's contract with CVLR.

165.   As a direct and proximate result of S & R Farm's breach of contract, CVLR lost the

benefit of its bargain to purchase the riding center and lost the expectancy of operating the riding

center.

166.   Thus, under Va. Code §§ 13.1-1049.1 and 13.1-1049.2, Beck and Lester are personally

liable to CVLR in equal fifty percent shares, not to exceed the total value of the assets that were

distributed to them, for the damages sustained by CVLR as a result of S & R Farm's breach of

contract.

167.   Accordingly, Ralph Beck and Shana Lester are liable to CVLR for CVLR's loss of the

benefit of the bargain to buy the riding center property in an amount equal to Four Hundred

Seventy Five Thousand Dollars ($475,000.00) and for CVLR's loss of the expectancy to operate

the riding center in an amount equal to One Million Dollars ($1,000,000.00), plus interest from

November 20, 2007.

COUNT THREE

TORTIOUS INTERFERENCE WITH PERFORMANCE OF CONTRACT
(AGAINST WYNNE AND 1650 PARTNERS, L.L.C.)

168.   The allegations of paragraphs 10 through 27 are adopted herein.

169.    Wynne and 1650 Partners intentionally and improperly interfered with the performance of the October 28, 2007 contract between CVLR and S & R Farm.  He caused, by making intentional false statements and by intentionally maintaining false pretenses, ODNB and Advantage Title to perform acts that were necessary to facilitate the breach of contract between CVLR and S & R Farm.

170.    <u>THE ACTS WYNNE COMMITTED THAT CONSTITUTED INTERFERENCE WITH THE CONTRACT:</u>  Wynne committed the following acts that constituted interference with the contract:

(a)    Wynne falsely told Charles Darnell of ODNB on October 12, 2007 that Wynne had a contract to purchase the riding center property;

(b)    Wynne maintained false pretenses towards ODNB by maintaining the fiction that he had created in his October 12, 2007 statement to Darnell that CVLR had agreed to assign to an "L.L.C. to be formed," and then to 1650 Partners, its right to purchase the riding center property, when CVLR had not agreed to assign its right to .  He maintained that fiction from October 12, 2007 through the closing on November 20, 2007;

(c)    Wynne, acting through 1650 Partners, purchased the riding center property even though he knew that CVLR had a contract to purchase the property and he knew that CVLR had not assigned its rights under the contract.

171.    <u>WYNNE'S INTENTIONAL INTERFERENCE CAUSED THE BREACH OF CONTRACT THAT OCCURRED.</u>   Wynne's acts "caused" the breach of contract.

(a)    The breach of contract would not have occurred if Wynne had not told ODNB on October 12, 2007 that he had a contract to purchase the property and if he had not maintained the fiction through the closing on November 20, 2007 that CVLR had agreed to assign to an "L.L.C.

to be formed," and then to 1650 Partners, its right to purchase the riding center property because ODNB would not have financed a sale of property to a person who did not have a right to purchase the property;

(b)     The breach of contract would not have occurred if Wynne, acting through 1650 Partners, had not purchased the riding center property.  He knew that CVLR had a contract to purchase the property and he knew that CVLR had not assigned its rights under the contract, yet he purchased the property anyway;

(c)     It is not a defense to this tortious interference claim that not every breach of contract is tortious interference.  An element of tortious interference is that the tortfeasor interferes with a contract to which he is not a party.  This element is satisfied here because Wynne interfered with the contract between S & R Farm and CVLR and caused the breach of the contract when he was not a party to the contract;

(d)     It is not a defense to this tortious interference claim that the contract might not have been completed even if Wynne had not tortiously interfered with the contract.  It is also not a defense that Wynne could have achieved the same end by waiting to see if the contract between S & R Farm and CVLR fell through and then purchasing the property himself.  Regardless of what might have been, Wynne made the conscious and knowing decision to interfere with the October 28, 2007 contract and he is liable for the consequences that flowed from his conduct.

172.     THE ELEMENTS OF TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS.  Wynne committed all of the acts that constitute the tort of "Intentional Interference with Performance of Contract by Third Parties," as ratified by the Virginia Supreme Court in Chavez v. Johnson, 230 Va. 112, 335 S.E.2d 97 (1985):

(a)     The October 28, 2007 contract between S & R Farm and CVLR constituted a valid contractual relationship;

(b)     Wynne knew of the contract because he was present when the contract was made and he received a copy of the contract by fax from Teresa Polinek on November 2, 2007;

(c)     Wynne, acting through 1650 Partners, interfered with the contract and caused it to be breached as described above;

(d)     CVLR was damaged because it lost the benefit of its contract to purchase the riding center property, in an amount to be proved at trial, no less than One Million Dollars ($1,000,000.00).

(e)     Malice is not a required element of the tort and need not be pleaded or proved. CVLR need only prove Wynne's intent to disturb it.  Wynne intended to disturb the contract; if he had not intended to interfere with it, he would not have caused the breach of contract by purchasing the property from S & R Farm.

<u>COUNT FOUR</u>

<u>VIOLATION OF VA. CODE § 18.2-499</u>
<u>(AGAINST WYNNE, 1650 PARTNERS, S & R FARM, BECK, AND LESTER)</u>

173.   The allegations of paragraphs 10 through 27 and paragraphs 91 through 99 are adopted herein.

174.   Wynne and 1650 Partners conspired and mutually acted together with its co-conspirator (S & R Farm, Beck, and Lester) for the purpose of willfully injuring CVLR in its business by the unlawful means of breach of contract, denying it the benefit of its contract to purchase the riding center property.

175.   <u>CVLR'S BUSINESS:</u>  CVLR's business was the operation of a riding academy on the riding center property.

176.   THE OBJECT OF THE CONSPIRACY:  The object of the conspiracy was to injure CVLR's business by denying it the contractual right to purchase the riding center property.

177.   THE CONSPIRATORS:  The following persons were conspirators:

(a)   Wynne and 1650 Partners are alter egos because Wynne at all times controlled 1650 Partners and, during the relevant period, was the only member of 1650 Partners.  No claim is made that Wynne and 1650 Partners conspired with each other;

(b)   S & R Farm was owned by Beck and Lester.  No claim is made that S & R Farm conspired with Beck and Lester;

(c)   Wynne and 1650 Partners (as one party to the conspiracy) conspired with S & R Farm, Beck, and Lester (as the second, third, and fourth parties to the conspiracy).

178.   WHAT THE CONSPIRATORS DID:  The conspirators committed the following acts to achieve the object of the conspiracy:

(a)   Wynne, 1650 Partners, S & R Farm, Beck, and Lester were all necessary to achieve the object of the conspiracy and each of them willfully performed its role so that the conspiracy was successful in injuring CVLR's business.

(b)   Wynne and 1650 Partners did the following:

(1)   Wynne falsely told Charles Darnell of ODNB on October 12, 2007 that Wynne had a contract to purchase the riding center property;

(2)   Wynne maintained false pretenses towards ODNB by maintaining the fiction that he had created in his October 12, 2007 statement to Darnell that CVLR had agreed to assign to an "L.L.C. to be formed," and then to 1650 Partners, its right to purchase the riding center property, when CVLR had not agreed to assign its right to purchase the property.  He maintained that fiction from October 12, 2007 through the closing on November 20, 2007;

50

(3)     Wynne, acting through 1650 Partners, purchased the riding center property from S & R Farm, Beck, and Lester after S & R Farm, Beck, and Lester had signed the November 13, 2007 deed conveying the property to 1650 Partners, even though they all knew that CVLR had a contract to purchase the property and they knew that CVLR had not assigned its rights under the contract.

(c)     S & R Farm, Beck, and Lester did the following:

(1)     Prior to November 13, 2007, they told their attorney, Sherwood Day, to prepare a deed conveying the property to 1650 Partners;

(2)     On November 15, 2007, they signed the deed conveying the property to 1650 Partners.

179.   <u>HOW THE CONSPIRATORS ACTED TOGETHER TO ACHIEVE THEIR GOAL:</u> Wynne, 1650 Partners, S & R Farm, Beck, and Lester combined together to effect a preconceived plan and unity of design and purpose.  They took the following concerted action:

(a)     Prior to November 13, 2007, S & R Farm, Beck, and Lester told their lawyer, Day, to draft the deed so that it conveyed the property to 1650 Partners;

(b)     As early as October 12, 2007, Wynne told ODNB that the purchaser would be 1650 Partners;

(c)     S & R Farm, Beck, and Lester would not have known to tell their lawyer to draft the deed to name 1650 Partners as the purchaser if they had not agreed with Wynne and 1650 Partners that 1650 Partners would be the purchaser of the property;

(d)     The actions of the conspirators were concerted actions that came together to allow them to achieve the object of their conspiracy;

(e)     The confluence of the conspirators' actions is clear and convincing evidence of at least a tacit understanding between them.  This evidence is sufficient to establish that they "combined, associated, agreed, mutually undertook or concerted together," under the standard stated in Tysons Toyota, Inc. v. Globe Life Ins. Co., 45 F.3d 428 (4th Cir. 1994).

180.    THE CONSPIRATORS COMMITTED AN UNLAWFUL ACT.  The conspirators committed the unlawful act of breaching CVLR's contract to purchase the riding center property, as stated in T.F. Slater & Son, Inc. v. Donald P. and Patricia A. Brennan L.L.C., 385 F.3d 836, 845-46 (4th Cir. 2004).

181.    THE CONSPIRATORS ACTED WILLFULLY.  The conspirators acted with legal malice.  They acted intentionally, purposely, and without legal justification.  They all knew what they were doing and that it would have the effect of denying CVLR the benefit of its contract to purchase the riding center property.

182.    It is not a defense to this claim that the conspirators may have also had motivations other than injuring CVLR's business; specifically, that S & R Farm, Beck, and Lester merely wanted to sell the property and that Wynne and 1650 Partners merely wanted to purchase the property. It is not a required element of proof that the conspirators' "primary and overriding" purpose was to injure CVLR; the conspirators' intentional, purposeful, and unlawful conduct demonstrates that they acted with legal malice.  Turbomin AB v. Base-X, Inc., Civil No. 6:09CV00007, slip op. at 5 (W.D. Va. Jun. 29, 2009) (Moon, J.).

183.    THE CONSPIRACY DAMAGED CVLR'S BUSINESS.  CVLR's business of operation of a riding academy on the riding center property was damaged because CVLR lost its contractual right to own the land on which it operated its center, the security of ownership that would have allowed investment for the future and growth of the business, and the right to create

equity in the property. CVLR was injured in an amount to be proved at trial, but no less than One Million Dollars ($1,000,000.00).

184.    The conspirators committed all of the acts that constitute a violation of the Virginia business conspiracy act. They acted in concert, with legal malice, and caused injury to CVLR's business.

## PRAYERS FOR RELIEF

185.    FOR THE REASONS stated herein, the plaintiff prays that this Court will accord it legal and equitable relief as allowed by law.

### LEGAL AND EQUITABLE RELIEF FOR COUNT ONE
### (AGAINST JOHN WYNNE, 1650 PARTNERS L.L.C., AND RIVERMONT CONSULTANTS, INC.

186.    The plaintiff prays that this Court will enter a judgment against John Wynne, 1650 Partners, and Rivermont Consultants, Inc.:

(a)    reaching the conclusion of law that Wynne used 1650 Partners and Rivermont Consultants, Inc., as a vehicle to commit bank fraud and wire fraud in violation of 18 U.S.C. § 1962(c);

(b)    reaching the conclusion of law that CVLR was damaged as a direct and proximate result of Wynne's bank fraud and wire fraud by the loss of the value of its contract to purchase the riding center property in an amount to be proved at trial, but no less than One Million Dollars ($1,000,000.00) , trebled to Three Million Dollars ($3,000,000.00);

(c)    reaching the conclusion of law that CVLR was damaged as a result of Wynne's use of 1650 Partners and Rivermont as an instrument of bank fraud and wire fraud by the loss of the value of CVLR's insurance policy, in an amount to be proved at trial, but no less than

FortyThousand Dollars ($40,000.00), trebled to One Hundred Twenty Thousand Dollars ($120,000.00);

      (d)     reaching the conclusion of law that CVLR was damaged as a direct result of Wynne's use of 1650 Partners and Rivermont as an instrument of bank fraud and wire fraud by the loss of the benefit of the bargain of purchasing the Ford F650 truck, the loss of the payments that it made to Rivermont to repay its loan to BB&T, and the loss of the value of the money that it paid to insure the vehicle owned by Rivermont, in an amount to be proved at trial, but no less than One Hundred Twenty Thousand Dollars ($120,000.00), trebled to Three Hundred Sixty Thousand Dollars ($360,000.00);

      (e)     permanently enjoining John Wynne from any business involving banking, the lending of money or the purchase and sale of real estate, or the management or holding of other people's money; enjoining 1650 Partners from conducting any business; enjoining Rivermont Consultants, Inc., from conducting any business; appointing a receiver to liquidate 1650 Partners and Rivermont, and account to this Court for the proceeds of the liquidation of those entities;

      (f)     awarding damages in favor of CVLR and against Wynne, 1650 Partners, and The Rivermont Banking Company in the amount to be proved at trial but no less than Three Million Four Hundred Eighty Thousand Dollars ($3,480,000.00), plus interest from November 13, 2007, and awarding CVLR all its attorney's fees and costs plus any other legal and equitable relief to which it may be entitled.

LEGAL AND EQUITABLE RELIEF FOR COUNT TWO
(AGAINST S & R FARM, RALPH BECK, AND SHANA LESTER)

187.    The plaintiff prays that this Court will enter a judgment against Ralph Beck and Shana Lester:

(a)      reaching the conclusion of law that S & R Farms, breached its October 28, 2007 contract with the plaintiff, that defendants Ralph Beck and Shana Lester are personally responsible for S & R Farms' liability for breach of the contract with CVLR because they were the only members of S & R, they dissolved S & R even though they knew that CVLR had a claim against S & R , and they did not provide notice of the dissolution of S & R to the public or to CVLR;

(b)      awarding damages in favor of CVLR and against Ralph Beck and Shana Lester in the amount to be proved at trial but no less than compensatory damages for the loss of the value of the riding center real estate in the amount of Four Hundred Seventy Five Thousand Dollars ($475,000.00), loss of the business expectancy of operating the riding center in the amount of One Million Dollars ($1,000,000.00), plus interest from November 13, 2007, and awarding CVLR all its attorney's fees and costs plus any other legal and equitable relief to which it may be entitled.

<u>LEGAL AND EQUITABLE RELIEF FOR COUNT THREE</u>
<u>(AGAINST WYNNE AND 1650 PARTNERS, L.L.C)</u>

188.    The plaintiff prays that this Court will enter a judgment against John Wynne and 1650 Partners;

(a)      reaching the conclusion of law that Wynne and 1650 Partners committed the tort of intentional interference with CVLR's October 28, 2007 contract with S & R Farm;

(b)      awarding damages in favor of CVLR and against Wynne and 1650 Partners in the amount to be proved at trial but no less than compensatory damages for the loss of the value of the riding center real estate in the amount of Four Hundred Seventy Five Thousand Dollars ($475,000.00), loss of the business expectancy of operating the riding center in the amount of One Million Dollars ($1,000,000.00), plus interest from November 20, 2007, and awarding

CVLR all its attorney's fees and costs plus any other legal and equitable relief to which it may be entitled.

## LEGAL AND EQUITABLE RELIEF FOR COUNT FOUR
## (AGAINST WYNNE, 1650 PARTNERS, S & R FARM, BECK, AND LESTER)

189.    The plaintiff prays that this Court will enter a judgment against John Wynne, 1650 partners,  S & R Farm, Ralph Beck, and Shana Lester:

(a)    reaching the conclusion of law that Wynne, 1650 Partners,  S & R Farm, Ralph Beck and Shana Lester conspired to willfully and maliciously injure CVLR in its business in violation of Va. Code § 18.2-499;

(b)    reaching the conclusion of law that CVLR was damaged as a direct and proximate result of the defendants' concerted action by the loss of the value of its contract to purchase the riding center property and the loss of the expectancy of operating its business on the riding center property in an amount to be proved at trial, but no less than One Million Dollars ($1,000,000.00), trebled to Three Million Dollars ($3,000,000.00);

(c)    awarding damages in favor of CVLR and against Wynne, 1650 Partners, Old Dominion National Bank, Advantage Title & Closing Company, Ralph Beck and Shana Lester in the amount to be proved at trial but no less than Three Million Dollars ($3,000,000.00), plus interest from November 20, 2007, and awarding CVLR all its attorney's fees and costs plus any other legal and equitable relief to which it may be entitled.

## DEMAND FOR JURY TRIAL

190.    CVLR demands trial by jury.

Respectfully Submitted,

CVLR PERFORMANCE HORSES, INC.

By: /s/ Gary M. Bowman

Gary M. Bowman, Esq.
VSB No. 28866
2728 Colonial Avenue, Ste. 100
Roanoke, VA  24011
Tel:    (540) 343-1173
Fax:    (540) 774-0063

VERIFICATION

I, acting on behalf of CVLR Performance Horses, Inc., have read the foregoing, verify

the facts stated herein based on my personal knowledge of these facts, and have directed

plaintiff's counsel to file this Amended Verified Complaint.

CVLR PERFORMANCE HORSES, INC.

By:     Its President, Crystal Rivers

 /s/ Crystal V.L. Rivers

December 21, 2011


/s/ Gary M. Bowman
Virginia Bar Number:  28866
Attorney for Plaintiff
Gary M. Bowman, Attorney at Law
2728 Colonial Avenue, Ste. 100
Roanoke, Virginia  24015
Tel:     (540) 343-1173
Fax:     (540) 774-0063
(E-mail:  garymbowman3@cox.net)