CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

APR 0 2 2012

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

|  |  |
|---|---|
| CVLR PERFORMANCE HORSES, INC., | CASE NO. 6:11-cv-00035 |
| *Plaintiff*, | |
| v. | MEMORANDUM OPINION |
| JOHN L. WYNNE, ET AL., | |
| *Defendants*. | JUDGE NORMAN K. MOON |

This action arises out of business dealings and financial transactions between the Plaintiff, CVLR Performance Horses, Inc. ("CVLR"), and various business entities and individuals. Previously, I conducted a hearing on Defendants' original motions to dismiss CVLR's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). At that time, I took the motions under advisement upon CVLR's representation that it wished to amend its complaint. Eventually, I granted CVLR leave to amend its complaint, denied the original motions to dismiss as moot, and permitted Defendants to renew their motions to dismiss. Thereafter, CVLR filed an amended complaint in which it seeks compensatory damages as well as equitable relief. Defendants subsequently renewed their motions to dismiss.

CVLR brings a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. In addition, CVLR asserts state law claims for breach of contract, tortious interference with the performance of contract, and business conspiracy in violation of Virginia Code § 18.2-499. However, my inquiry begins and ends with the RICO claim, which I find is unsupported by CVLR's factual allegations, and without which I lack jurisdiction over this matter. Accordingly, for the reasons that follow, I will dismiss the case.

# I. BACKGROUND

At nearly 60 pages and 189 paragraphs in length, CVLR's amended complaint does not lend itself to a concise summary. Nevertheless, I will endeavor to restate the multitude of facts alleged, which at this stage I must accept as true.

## A. Facts Relating to the Purchase of the Riding Center Property

In late 2006, Crystal Rivers ("Ms. Rivers"), the president of CVLR, visited the office of John Wynne ("Mr. Wynne") in response to an advertisement for the rental of pasture land. At the time, Mr. Wynne was the president of The Rivermont Banking Company, Inc., which is now known as Rivermont Consultants, Inc. ("Rivermont"). In the course of their conversation, Mr. Wynne represented to Ms. Rivers that Rivermont was a bank and he agreed, ostensibly on behalf of Rivermont, to finance the purchase of real estate and equipment for CVLR's horse riding business.

On October 12, 2007, Mr. Wynne contacted Charles Darnell ("Mr. Darnell"), the president of Old Dominion National Bank ("Old Dominion"), to inquire about a loan. Mr. Wynne told Mr. Darnell that he had a contract to purchase riding center property for $475,000.00. The riding center property was known as the Serene Creek Riding Center and was owned by S & R Farm, LLC ("S & R Farm"). According to CVLR, that statement was false; Mr. Wynne had no such contract. However, Mr. Darnell prepared a "loan presentation," which indicated that Old Dominion would be financing 100% of the riding center property's purchase price. On October 28, 2007, Mr. Wynne obtained the signatures of the two members of S & R Farm, Ralph Beck ("Mr. Beck") and Shanna Lester ("Ms. Lester"), as well as Ms. Rivers, on a real estate contract under which S & R Farm promised to sell the riding center property to "CVLR Performance Horses or Assignee." The next day, Old Dominion approved the loan with

the borrower listed as "an LLC to be formed" and the guarantors listed as Mr. Wynne and Ms. Rivers.

CVLR alleges that Ms. Rivers saw the loan approval letter and the real estate contract on November 2, 2007. According to CVLR, Ms. Rivers thought that the purchaser would be her closely held corporation, CVLR, and that the "LLC to be formed," of which she would be a member, would finance the sale by borrowing the money from Old Dominion. Further, she thought that CVLR would give a "mortgage" to the new LLC to secure its repayment of Old Dominion's loan. Ms. Rivers did not know that Mr. Wynne had told Old Dominion that 1650 Partners, LLC ("1650 Partners"), a preexisting LLC controlled by Mr. Wynne, would be the sole purchaser.

On November 20, 2007, the closing on the sale of the riding center property was conducted, the result of which was the conveyance of the property from S & R Farm to 1650 Partners. Prior to the closing, the operating agreement for 1650 Partners was amended to give Ms. Rivers a 0.01% interest in 1650 Partners. At the closing, Ms. Rivers signed various documents, thinking that the property was being conveyed to CVLR and that CVLR was giving a "mortgage" for the riding center property. Ms. Rivers told Mr. Wynne that this is what she thought, and he told her that her understanding was correct.

### B. Facts Relating to S & R Farm's Alleged Breach of Contract

S & R Farm entered into the October 28, 2007 real estate contract, promising to sell the riding center property to "CVLR Performance Horses or Assignee." However, CVLR alleges that on November 13, 2007, S & R Farm directed its attorney to prepare a deed conveying the property to 1650 Partners instead. On November 15, 2007, S & R Farm's members, Mr. Beck and Ms. Lester, executed the deed. CVLR maintains that it never assigned or intended to assign

its contractual right to purchase the riding center property and that there is no writing constituting such an assignment. However, CVLR alleges that S & R Farm nevertheless sold the property to 1650 Partners in breach of the contract. As a result, CVLR claims it lost the benefit of its bargain to purchase the riding center as well as the expectancy of operating it.

### C. Facts Relating to Mr. Wynne's Acquisition of CVLR's Insurance Proceeds

Working under the assumption that it owned the riding center property, CVLR purchased a general liability policy from American Bankers Insurance Company ("American Bankers"), covering the riding center property and listing Old Dominion as the loss payee. In February 2008, wind damage occurred at the riding center property. Thereafter, CVLR filed an insurance claim with American Bankers. After three estimates for fixing the damage were obtained and submitted, American Bankers approved a payment of $38,000.00 to repair the barn. However, Mr. Wynne told CVLR that he could get Glen White, a general contractor with whom he worked, to do the work for less. CVLR agreed to allow Glen White to do the work.

On April 7, 2008, American Bankers issued to "CVLR Performance Horses, Inc. and Old Dominion National Bank" two checks totaling $26,309.24. On April 20, Mr. Wynne emailed an employee of Old Dominion and requested that he "get the insurance proceeds released so I can repair the buildings." Mr. Wynne stated that Terrance White would do the work. He wrote that he "expect[ed] the costs to be around $10,000.00. The remaining proceeds will be used to make capital additions to the property." He also wrote that "I would hope you would put the proceeds into the 1650 checking account." According to CVLR, Glenn White, the contractor whom Mr. Wynne had recommended, came to the riding center and began work reconstructing the barn in the spring of 2008. However, he never finished the job, and instead used some of the construction materials intended for the barn on another commercial worksite.

CVLR further alleges that Mr. Wynne sent a forged letter to the insurance adjustor on September 18, 2008. The letter was allegedly on the letterhead of Glen White and was signed with the initials "GDW." The letter requested payment of attached invoices, payable to Mr. Wynne. The letter falsely stated that "The project is complete and CVLR, Old Dominion Nat'l Bank and Mr. Wynne w/1650 Partners LLC wants to close the book on this project." According to CVLR, the letter is a forgery because it is handwritten by Mr. Wynne but purports to be from Glen White. The repairs to the barn had not yet been completed and CVLR, the named insured, had not authorized the insurance company to close the book on the project. The invoices attached to the fax were from "Terrance White T/A White Construction," but Terrance White was employed by Mr. Wynne and was not a licensed contractor. Ultimately, insurance proceeds were paid out to Terrance White, who endorsed all of the checks over to Rivermont.

### D. Facts Relating to the Purchase of the Ford F650 Truck

The facts alleged in this regard are many and confusing. While I have tried to distill them as clearly as possible, perfect clarity is unattainable. On February 9, 2007, Mr. Wynne, acting for Rivermont, placed a buyer's order for a 2002 Ford F450 truck at Battlefield Ford in Manassas, Virginia. The sales price of the truck was $26,500.00. The truck was titled in the name of Rivermont. Mr. Wynne and Ms. Rivers agreed that the truck was for the use of CVLR, which operated and insured the vehicle. However, the truck had mechanical problems, and so Mr. Wynne and Ms. Rivers agreed to trade it in.

On May 8, 2007, Ms. Rivers completed a buyer's order for a 2006 Ford F650 truck and signed a promissory note in favor of Battlefield Ford in the amount of $76,508.86.[1] A receipt certifying delivery of the Ford F650 truck to "Buyer Crystal Victoria Lee Rivers" was signed and

---

[1] The total delivered price was in excess of $100,000, but Battlefield Ford gave Ms. Rivers credit for the trade-in value of the defective Ford F450 truck that she and Mr. Wynne had previously purchased.

given to Ms. Rivers. An "Application for Certificate of Title and Registration" was prepared at Battlefield Ford listing the owners of the Ford F650 truck as Ms. Rivers and Mr. Wynne. However, a "Temporary Certificate of Title" was issued to "Crystal Victoria Lee Rivers."

On May 21, 2007, Rivermont and Mr. Wynne (as parties of the first part) and CVLR and Ms. Rivers (as parties of the second part) entered into a "Lease, Loan, and Contract to Buy Agreement" drafted by Mr. Wynne. By signing it, CVLR agreed to pay Rivermont interest of 8.5% per annum on any money that CVLR borrowed from Mr. Wynne. The agreement also required CVLR to pay the principal and interest owed by Mr. Wynne and Rivermont to Mr. Wynne's creditor if Mr. Wynne borrowed money to purchase equipment to sell to CVLR. Additionally, the agreement provided that CVLR and Ms. Rivers were deemed to have "borrowed various monies" and "agreed to purchase certain pieces of equipment to include" a 2002 Ford F450 truck.

On June 18, 2007, Mr. Wynne sent a handwritten fax to Battlefield Ford stating:

> This is the deal as I understand it please confirm. I am giving Battlefield title to the 2002 F450 with trade in value of $27,673.27. I am also to wire $16,000 [sixteen Thousand Dollars] to Battlefield. Crystal Rivers is signing a $60,508.86 promissory note to be held by David. On July 1 2007 Crystal is to pay that note out. Upon receipt of my $16,000 wire the vehicle will be titled in the names: John Leigh Wynne and Crystal Victoria Leigh Rivers.

The same day, Ms. Rivers sent a fax to Battlefield Ford saying that Mr. Wynne "is prepared to wire the additional $16,000 today. I will send the original Guarantee of Title & Title. I need another Promissory Note for the remaining balance $60,508.86. Money will be wired to you from me for that amount." Under the May 21 "Lease, Loan and Contract to Buy Agreement," Mr. Wynne had already committed in writing to loan her the money to purchase the truck. On June 28, 2007, Rivermont paid $16,000.00 to Battlefield Ford. Subsequently, Battlefield Ford prepared a note to be signed by Ms. Rivers in the amount of $60,508.86.

On September 20, 2007, Battlefield Ford wrote to Ms. Rivers, informing her that nothing had been paid on the original promissory note. When she received the letter, Ms. Rivers asked Mr. Wynne why he had not paid Battlefield Ford for the truck. Allegedly as a result of her questioning, on September 26, 2007, Rivermont applied for a loan from BB&T Equipment Finance for the purpose of paying Battlefield Ford the purchase price of the Ford F650 truck. Mr. Wynne faxed to BB&T a buyer's order showing that the purchase price of the truck was $104,215.34, but Rivermont also received a participation fee of $3,126.46 from BB&T. The "BB&T Equipment Finance Loan and Security Agreement" signed by Rivermont required CVLR to pay 72 equal monthly installments for a total, after interest, of $142,338.96.

A receipt certifying delivery of the Ford F650 truck to Rivermont was signed and given to Mr. Wynne at Battlefield Ford on September 27, 2007. Thus, the receipt certified to Rivermont delivery of the same truck that had been certified as delivered to Ms. Rivers on May 8, 2007. Also on September 27, 2007, Mr. Wynne, acting for Rivermont, signed an "Odometer Disclosure Statement" stating that the mileage on the odometer of the Ford F650 truck was 3,936 miles. However, CVLR alleges that this statement was patently false because there were 3,936 miles on the truck on May 8, 2007 when Ms. Rivers signed the "Odometer Disclosure Statement" for the same vehicle that she had driven throughout the summer of 2007. Mr. Wynne had the truck titled in the name of Rivermont on September 27, 2007, despite the fact that it had already been titled in the name of Ms. Rivers on May 8, 2007.

Mr. Wynne obtained the benefit of the warranty for the truck engine by allowing Battlefield Ford to change the date on the Caterpillar truck engine warranty registration from May 8, 2007 (the date that Ms. Rivers originally signed the warranty form) to September 27, 2007, and by drawing a line through Ms. Rivers's name and writing "wrong sales info" next to

her name. Additionally, Mr. Wynne obtained the benefit of the Allison transmission warranty by having Battlefield Ford enter that Rivermont was the owner of the warranty, based on the signature "on file." However, the signature on file was that of Ms. Rivers. Similarly, the signature on the Caterpillar engines and transmissions warranty form is Ms. Rivers's "on file" signature, even though the owner of the warranty is listed as Rivermont. On September 27, 2007, at Mr. Wynne's request, a salesman employed by Battlefield Ford prepared a new buyer's order with the same deal number as the buyer's order signed by Ms. Rivers on May 8, 2007. Thus, the new buyer's order indentified Rivermont as the purchaser of the same truck that Ms. Rivers had previously purchased. Further, it listed the total delivered price as $100,730.34 plus an extended service contract of $3,485.00, but did not provide credit for any trade in or down payment, making the net sales price $104,215.34.

Thus, CVLR alleges that Mr. Wynne, acting through Rivermont, falsely represented that the balance due to Battlefield Ford was $104,215.34. But as outlined in Mr. Wynne's June 18, 2007 fax to Battlefield Ford, which described "the deal," Rivermont had paid $16,000.00 down and traded-in the Ford F450 truck for $27,673.27, making the actual balance due $60,508.86. Ultimately, when Battlefield Ford obtained the $107,341.80 in loan proceeds from BB&T, it made out a check for the difference in the amount of $43,673.27, payable to Mr. Wynne.

### E. Facts Relating to Rivermont's Use of Ms. Rivers's Auto Insurance Policy

On February 1, 2007, Mr. Wynne purchased a 1999 Chevrolet Tahoe and titled it in the name of Rivermont. Without Ms. Rivers's knowledge or consent, Mr. Wynne telephoned Margie Callahan ("Ms. Callahan"), who was Ms. Rivers's State Farm insurance agent, and told her that Ms. Rivers had authorized him to add Rivermont's 1999 Chevrolet Tahoe to Ms.

Rivers's auto insurance policy.  At that time, Ms. Callahan represented that such could not grant

Mr. Wynne's request because of his previous DUI conviction.

On April 16, 2007, according to Ms. Callahan's notes, Mr. Wynne requested that State

Farm "re-instate" insurance coverage for the Tahoe.  It appears that the Tahoe was added to Ms.

Rivers's policy at this point.  However, on May 2, 2007, State Farm cancelled coverage of the

Tahoe on Ms. Rivers's auto insurance policy because the State Farm underwriting department

recognized that Ms. Rivers was not the owner of Rivermont.

On September 13, 2007, Mr. Wynne again telephoned Ms. Callahan in order to apply for

reinstatement of the coverage of his Tahoe on Ms. Rivers's policy, falsely claiming that Ms.

Rivers was an employee of Rivermont.  Evidently, the Tahoe was reinstated on Ms. Rivers's

policy.  On October 9, 2007, Mr. Wynne's teenage son wrecked the Tahoe in an accident,

resulting in a total loss of the vehicle.  Mr. Wynne called Ms. Rivers and asked her to call Ms.

Callahan to inform her about the wreck.  According to CVLR, Ms. Rivers called Ms. Callahan

because she thought Mr. Wynne was upset.

On October 22, 2007, a State Farm representative called Ms. Rivers and told her that

State Farm was prepared to send a check to pay her claim.  Ms. Rivers told the representative

that she had not made a claim and, according to the State Farm activity log, "verified that she

does not have anything to do with this vehicle so need to [speak with] the owner John Wynne."

The representative then called Mr. Wynne who "verified he owns the Rivermont Banking Co.

and Crystal could drive the vehicle and should have been listed as driver not insured."  The

representative asked Mr. Wynne to provide proof that he owned Rivermont.  Mr. Wynne sent to

State Farm an allegedly forged 2007 Annual Report of Rivermont that was originally signed by

his attorney on January 26, 2007.  The original document did not list Mr. Wynne as having a role

in Rivermont. According to CVLR, Mr. Wynne changed the form in the following ways: he checked the box labeled "addition," checked the boxes "officer" and "director," and added "John L. Wynne Chairman, President and CEO" to the form. He faxed the allegedly forged form to State Farm on October 26, 2007. Ultimately, he obtained $10,630.00 in State Farm insurance proceeds as a result of the purportedly fraudulent claim.

### F. Facts Relating to Forgery of Ms. Rivers's Name on 1650 Partners Checking Account

CVLR alleges that on October 1, 2008, Mr. Wynne forged Ms. Rivers's name on a 1650 Partners check and presented it for payment at Bank of the James. Bank of the James paid the forged check and presented it for collection to Old Dominion, which in turn paid out $3,000.00.

### G. Facts Relating to Mr. Wynne's Foreclosure of Karen Foster's Home

In early 2006, Karen Foster ("Ms. Foster") sought real estate financing from Rivermont, assuming it was a bank. On August 23, 2006, Ms. Foster executed a note in favor of Mr. Wynne in the amount of $40,000.00 on account of money that Mr. Wynne had loaned to her in small increments. The note was secured by a deed of trust on Ms. Foster's home in Lynchburg, Virginia. Mr. Wynne made no demand for payment of the note.

On September 25, 2008, Peter Sackett ("Mr. Sackett") conducted a putative foreclosure sale of Ms. Foster's property. Mr. Wynne bid-in the property for $40,000.00. However, CVLR alleges that Mr. Wynne knew there was a preexisting Bank of America mortgage on the property. Bank of America held the first deed of trust on the property, but Mr. Sackett did not pay Bank of America from the proceeds of the foreclosure sale. After Mr. Sackett had spent the foreclosure proceeds for other purposes, Mr. Wynne paid Mr. Sackett $72,000.00 from the Southgate Leigh Wynne Trust to be paid to Bank of America, which received the funds on January 12, 2010.

Separately, Mr. Wynne submitted a financial statement (signed on April 23, 2009) to Old Dominion. The financial statement listed as an asset of Mr. Wynne's what was formerly Ms. Foster's property. Mr. Wynne stated that the property had a value of $200,000 and had no mortgage. CVLR asserts that at the time the financial statement was submitted, it was false because the Bank of America note had not been paid and the deed of trust had not been released. Moreover, CVLR alleges that Mr. Wynne submitted the financial statement to support his application to renew 1650 Partners's $475,000.00 loan to purchase the riding center property.

### H. Facts Relating to Mr. Wynne's Dealings with Vicki Marsh

According to CVLR, Vicki Marsh ("Ms. Marsh") is a former friend of Mr. Wynne's. In September 2006, Ms. Marsh was house-sitting for Mr. Wynne at his home in Lynchburg. While clearing a place to sleep in Mr. Wynne's guest bedroom, Ms. Marsh saw a piece of paper that described property she owned in Pawley's Island, South Carolina. The paper also listed "16 horses." Ms. Marsh later asked Mr. Wynne about the paper and Mr. Wynne evidently said "it was to start up Rivermont," "$60,000 was to help Karen out" and "to help the girl with the horses out." At that time, Ms. Rivers had no relationship with Mr. Wynne except that she rented pasture from him and had pledged sixteen horses as security. CVLR alleges that the paper Ms. Marsh discovered is evidence that Mr. Wynne had conceived of a unified scheme to defraud Ms. Marsh, Ms. Foster, and Ms. Rivers.

On November 8, 2006, Mr. Wynne purchased a $60,000.00 certificate of deposit at First Bank and Trust Company ("First Bank") in the name of Rivermont. Thereafter, Ms. Marsh opened a credit line with First Bank. Evidently, the credit line was approved because of the "influence" of Rivermont having just purchased the certificate of deposit. According to CVLR, Mr. Wynne's purpose in having Ms. Marsh obtain the line of credit at First Bank was to bolster

11

Ms. Marsh's credit score so that, with the temporary equity that he would create in her house at Pawley's Island, she could obtain a mortgage from another bank.

On March 2, 2007, Ms. Marsh conveyed half of the interest in her Pawley's Island property to Mr. Wynne. Shortly thereafter, Mr. Wynne paid approximately $450,000.00 to a South Carolina court as settlement of a partition dispute with Ms. Marsh's co-owners. Mr. Wynne allegedly obtained the funds by borrowing the money from a bank whose identity CVLR does not know.

On March 30, 2007, Wachovia loaned Ms. Marsh $501,461.75, secured by her property (half of which, by the time of the closing, had been conveyed to Mr. Wynne). CVLR maintains that it was Mr. Wynne's intention to build a new house on Ms. Marsh's property. In September 2007, Mr. Wynne found that he could not obtain the financing necessary to build the new house. However, Mr. Wynne listed his interest in the Pawley's Island house in the financial statement he provided to Old Dominion on October 12, 2007 when he originally sought financing for the purchase of the riding center property. He listed the market value of the house as $1 million.

According to CVLR, Ms. Marsh earns only $7,000 per year and has no means of repaying the loan. Allegedly, the proceeds of the loan were paid to Mr. Wynne who made all of the payments on the loan up until September 2008, at which point he stopped making payments altogether. Mr. Wynne was never added as a borrower on the Wachovia mortgage even though he received the proceeds of the loan and obtained a half-interest in Ms. Marsh's property. According to CVLR, Ms. Marsh recalls Mr. Wynne telling her in September 2008 that he was going to let Wachovia foreclose, buy the property on a short-sale, and that she was "[expletive deleted] out of luck." Further, CVLR alleges that Mr. Wynne has attempted to persuade Wells

Fargo, which now owns Ms. Marsh's note, to allow him to purchase the property for less than Ms. Marsh owes on the note.

**I. Facts Relating to Mr. Wynne's Conduct toward Ms. Rivers, Ms. Foster, and Ms. Marsh**

As a general matter, CVLR alleges that the money Mr. Wynne obtained through Rivermont and 1650 Partners was intermingled and the proceeds of his transactions with one "victim" were used to finance transactions with the other "victims." For example, on July 23, 2008, Old Dominion issued a cashier's check to Terrance White for payment of a false invoice submitted by Mr. Wynne (who represented himself by forgery as contractor Glen White) for work done to repair the damaged barn at the riding center. Terrance White endorsed the check "for deposit only" to Rivermont, and the check was ultimately deposited into Mr. Wynne's personal checking account at Bank of the James. CVLR alleges that with the funds from the insurance proceeds (intermingled with other funds from Rivermont and 1650 Partners), Mr. Wynne then wrote a check from his personal checking account to Mr. Sackett in the amount of $16,000.00 in order to pay the deposit on Mr. Wynne's purchase of Ms. Foster's property at the foreclosure sale that Mr. Sackett conducted on September 25, 2008.

In another instance, Ms. Rivers was shown (by a special agent working for the Virginia State Police) records of deposits into the Bank of the James account entitled Southgate Leigh Wynne Trust that match the amounts of cashier's checks that CVLR paid to Old Dominion for what Ms. Rivers thought was her mortgage payment. Mr. Wynne made payments on Ms. Marsh's Wachovia note from the same Southgate Leigh Wynne Trust account. Thus, CVLR contends Ms. Marsh's mortgage was paid with funds from CVLR's putative "mortgage" payments.

Additionally, CVLR states that Mr. Wynne used the equity in real estate that he obtained from his "victims" to increase the appearance of his net worth so that he could obtain new financing. For example, in April 2009, 1650 Partners applied to Old Dominion to renew financing of the riding center property. In the Old Dominion loan presentation made on April 23, 2009, Mr. Darnell stated that Mr. Wynne owned "a vacation home in Pawley's Island, SC valued at $1,300K with a $500K mortgage (owns 50%) . . . ." Another example cited by CVLR is an attempt by Mr. Wynne to obtain financing from Old Dominion for a proposed Ivy Lake Waterfront Condominium Project in Forest, Virginia. Mr. Wynne allegedly submitted a personal financial statement as of December 31, 2009, in which he listed as an asset: "1/2 Residential Property . . . Pawley's Island South Carolina . . . I own 1/2 but not on any debt so value represents my equity interest." Mr. Wynne also listed Ms. Foster's property as an asset, with a market value of $200,000.00 and a loan balance of zero, notwithstanding the fact that Bank of America's first mortgage on the property had not yet been paid off.

## II. LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Legal conclusions in the guise of factual allegations, however, are not entitled to a presumption of truth. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950–51 (2009).

Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* In other words, Rule 12(b)(6) does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

## III. DISCUSSION

Despite the tangle of allegations presented in CVLR's amended complaint, it is clear that the threshold issue at this juncture is whether CVLR has stated a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. CVLR's RICO claim is its only basis for federal subject matter jurisdiction given that the citizenship of the parties is not completely diverse.

### A. RICO Claim

In Count I of its amended complaint, CVLR asserts a RICO claim against Defendants Mr. Wynne, 1650 Partners, and Rivermont. In RICO, Congress set out to broadly proscribe racketeering activity carried out in the context of criminal enterprises. *See Beck v. Prupis*, 529 U.S. 494, 496 (2000) (stating that Congress enacted RICO "for the purpose of seek[ing] the eradication of organized crime in the United States") (internal quotation marks and citation omitted). To that end, RICO provides, in part:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). In enacting RICO, Congress also created a private right of action, which provides, in pertinent part, that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains . . . ." 18 U.S.C. § 1964(c). Thus, in its RICO cause of action, CVLR is suing Mr. Wynne, 1650 Partners, and Rivermont under § 1964(c) for violating § 1962(c).

A violation of § 1962(c) requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). The term "racketeering activity" has been defined in RICO to mean "'any act or threat involving' specified state-law crimes, any 'act' indictable under various specified federal statutes, and certain federal 'offenses.'" *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 232 (1989) (quoting 18 U.S.C. § 1961(1)). CVLR alleges that Mr. Wynne, through the operation of the entities he controls, has committed racketeering acts and preyed upon women in financial distress who relied upon his purported expertise as a banker.[2] The object of Mr. Wynne's racketeering scheme, according to CVLR, is obtaining money and property by illegal means for the purpose of Mr. Wynne's financial enrichment.

---

[2] Although Ms. Marsh, Ms. Foster, and Ms. Rivers are not parties in this action, I note that non-plaintiffs can be considered victims for purposes of establishing a pattern of racketeering under a RICO claim. *See GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 548 (4th Cir. 2001) (citing *Menasco v. Wasserman*, 886 F.2d 681, 685 (4th Cir. 1989)).

## 1. Predicate Acts Alleged

In its amended complaint, CVLR breaks down the predicate acts that underlie its RICO cause of action. I have done the same here for the sake of clarity.

i. <u>Predicate Act 1: Bank Fraud in Purchasing the Riding Center Property</u>

One form of racketeering activity is any act which is indictable under 18 U.S.C. § 1344 relating to financial institution fraud. 18 U.S.C. § 1961(1)(B). Section 1344—more commonly known as the bank fraud statute—provides, in part, that it is unlawful to execute a scheme or artifice to defraud a financial institution or to obtain any of the moneys or property owned or controlled by the institution. 18 U.S.C. § 1344.[3]

CVLR alleges that Mr. Wynne defrauded Old Dominion National Bank by: (1) telling its president, Mr. Darnell, that he had a contract to purchase the riding center property when neither he nor 1650 Partners had such a contract; (2) maintaining the fiction that he had such a contract from October 12, 2007 to November 20, 2007, the date of the closing at which he signed documents as "borrower" and "purchaser"; and (3) obtaining from Old Dominion $475,000.00 in loan proceeds for the benefit of 1650 Partners, an entity he controlled. According to CVLR, this bank fraud in violation of 18 U.S.C. § 1344 allowed Mr. Wynne to hold title to the land and permitted him to eject CVLR at any time, which he eventually did. Meanwhile, CVLR made the mortgage payments and paid the insurance premiums on the assumption that it had an ownership interest in the riding center property.

---

[3] In federal court, fraud claims—including those pled as the basis of a RICO claim—are subject to the heightened pleading standard set out in Federal Rule of Civil Procedure 9(b). *See Menasco*, 886 F.2d at 684. Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The "circumstances" required to be pled with particularity under Rule 9(b) are "'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (quoting 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 1297, at 590 (2d ed. 1990)). "[L]ack of compliance with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule 12(b)(6)." *Id.* at 783 n.5

ii. Predicate Act 2: Wire Fraud in Obtaining Proceeds of CVLR's Insurance Policy[4]

Another form of racketeering activity proscribed by RICO is any act which is indictable under 18 U.S.C. § 1343 relating to wire fraud. 18 U.S.C. 1961(1)(B). Broad in scope, the wire fraud statute makes it unlawful to devise any scheme or artifice or to execute such a scheme or artifice by means of a wire in interstate commerce. 18 U.S.C. § 1343; *see also Am. Chiropractic v. Trigon Healthcare*, 367 F.3d 212, 233 (4th Cir. 2004) (stating that in order to allege wire fraud, a plaintiff must plead (1) a scheme disclosing an intent to defraud, and (2) the use of interstate wires in furtherance of the scheme). CVLR alleges that Mr. Wynne, acting through Rivermont, committed wire fraud when, in 2008, he represented to Old Dominion through faxes of false invoices and a letter (forged by Mr. Wynne in the name of contractor Glen White) that he was due money paid out by American Bankers to Old Dominion for repair work on the riding center that was never done. Allegedly, Mr. Wynne's employee, Terrance White, endorsed the insurance checks over to Rivermont, which was solely owned by Mr. Wynne. Thus, Mr. Wynne allegedly received over $35,000.00 from Old Dominion as a result of these false and forged invoices. According to CVLR, it owned the insurance policy and paid the premiums; therefore, it was entitled to these proceeds, not Mr. Wynne.

iii. Predicate Act 3: Wire Fraud and Bank Fraud in Obtaining Loan for Truck's Purchase

CVLR alleges that Mr. Wynne utilized Rivermont as an instrument to commit both wire fraud and bank fraud in connection with the purchase of the Ford F650 truck. With respect to the wire fraud allegation, CVLR maintains that in September 2007, Mr. Wynne faxed to BB&T a buyer's order, signed by him as "Pres/CEO of Rivermont," incorrectly showing: (1) that the balance due to Battlefield Ford was $104,215.34 when the actual amount due was $60,508.86

---

[4] In its amended complaint, CVLR labels the predicate act alleged here as "insurance fraud." However, the actual allegations make it clear that CVLR is instead pleading wire fraud.

and (2) that the odometer reading was 3,936 miles when it was actually much higher. According to CVLR, these representations allowed Rivermont to obtain $107,341.00 in total loan proceeds from BB&T, and subsequently a $43,673.27 refund from Battlefield Ford. These actions also amount to bank fraud, CVLR contends. The end result was that Mr. Wynne was able to pay nothing for the truck; the refund covered his downpayment and the value of the 2002 Ford F450 truck he had traded in. Moreover, Mr. Wynne was able to maintain ownership while the risk of loss for the truck shifted to BB&T and Ms. Rivers, who paid the insurance premiums and thought the truck was titled in her name when, in fact, the title had been changed to Rivermont's name.

Finally, CVLR alleges that Mr. Wynne obtained an additional $11,458.80 in interest payments from CVLR because under the "Loan, Lease, and Contract to Buy Agreement" drafted by Mr. Wynne, CVLR was required to pay the monthly installments to BB&T on Rivermont's loan as well as 8.5% per annum on the total loan amount to Rivermont. According to CVLR, the result was a cumulative interest rate of 19.34% per annum (10.84% to BB&T and 8.5% to Rivermont). CVLR maintains that its monthly payments would have been lower had Mr. Wynne financed through BB&T only the $60,508.86 that was needed. Instead, Mr. Wynne was able to claim an additional $11,458.80 in interest from CVLR because of the way he structured the financing, and he was able to maintain ownership of the vehicle in the process.

iv. <u>Predicate Act 4: Wire Fraud in Obtaining Auto Insurance Policy Benefits</u>

CVLR alleges that on February 1, 2007, Mr. Wynne telephoned Margie Callahan, a State Farm representative, and falsely told her that Ms. Rivers had authorized him to add Rivermont's 1999 Chevy Tahoe to Ms. River's auto insurance policy. Thereafter, Mr. Wynne faxed a forged version of Rivermont's annual report to State Farm. Eventually, after his son wrecked the

19

Tahoe, Mr. Wynne was able to obtain $10,630.00 in insurance proceeds after submitting a fraudulent claim.  CVLR asserts that in so doing, Mr. Wynne committed wire fraud.

v. Predicate Act 5: Bank Fraud in Presenting a Forged Check

CVLR alleges that Mr. Wynne defrauded a financial institution, and in so doing committed bank fraud, when, on October 1, 2008, he presented a 1650 Partners check on which he had signed Ms. Rivers's name (without her knowledge or permission) and obtained $3,000.00 for himself.

vi. Predicate Act 6: Bank Fraud in Foreclosure of Karen Foster's Home

Finally, CVLR claims that on April 23, 2009, Mr. Wynne falsely asserted in a financial statement that there was no mortgage on what was formerly Ms. Foster's property and that he owned it free and clear; however, he knew that Bank of America held a first deed of trust on the property.  According to CVLR, this false representation bolstered his loan renewal application and permitted him to obtain from Old Dominion the $475,000.00 loan to 1650 Partners to purchase the riding center property.

### 2. "Enterprise" under RICO

Defendants Mr. Wynne, Rivermont, and 1650 Partners contend that CVLR has failed to properly allege the existence of an "enterprise" as that term is contemplated by RICO.  To reiterate, § 1962(c) limits RICO liability to a "person employed by or associated with any enterprise."  18 U.S.C. § 1962(c).  Thus, to proceed on a claim brought under § 1962(c), a plaintiff must allege the existence of two entities: a "person" and an "enterprise."  *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).  RICO defines "person" and "enterprise" differently.  A "person" includes "any individual or entity capable of holding a legal or beneficial interest in property."  18 U.S.C. § 1961(3).  An "enterprise" includes "any

individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see also Palmetto State Med. Ctr., Inc. v. Operation Lifeline*, 117 F.3d 142, 148 (4th Cir. 1997) (defining "enterprise" under RICO as "an ongoing organization, formal or informal, in which the various associates function as a continuing unit").

In the instant case, CVLR alleges 1650 Partners, Rivermont, and the Southgate Leigh Wynne Trust[5] to be the enterprises and Mr. Wynne to be the person who controlled them and conducted their business.[6] However, the courts are in agreement that the person alleged to have violated § 1962(c) must be distinct from the enterprise. *Palmetto*, 117 F.3d at 148. Thus, "liability depends on showing that the defendants conducted or participated in the conduct of the *'enterprise's* affairs,' not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). In part, this is because a "recovery of money damages under 18 U.S.C. § 1964(c) is not against a RICO enterprise, but against a RICO defendant who is a 'person employed or associated with' a RICO enterprise." *Palmetto*, 117 F.3d at 148 (quoting 18 U.S.C. § 1962(c)).

The question, then, is whether the enterprises (1650 Partners and Rivermont) and the RICO defendant (Mr. Wynne) can be considered distinct for the purposes of § 1962. Bearing on this question is the United States Court of Appeals for the Fourth Circuit's conclusion that the word "enterprise" "was meant to refer to a being different from, not the same as or part of, the

---

[5] Because I do not believe the Southgate Leigh Wynne Trust falls within the definition of "enterprise" under RICO, I decline to consider it as one of Mr. Wynne's alleged enterprises. *See Bonner v. Henderson*, 147 F.3d 457, 460 (5th Cir. 1998) (concluding that "a trust does not qualify as a legal entity enterprise as contemplated by RICO").

[6] Defendants try to argue that an "enterprise" for purposes of RICO is that which is "acquired through the use of illegal activities or by money obtained from illegal activities." *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 259 (1994). However, the Supreme Court made abundantly clear that this quoted language characterizes the definition of enterprise under subsections (a) and (b) to § 1962. *Id.* "By contrast, the 'enterprise' in subsection (c) connotes generally the vehicle through which the unlawful pattern of racketeering activity is committed, rather than the victim of that activity." *Id.* In other words, the "enterprise" under subsection (c) "need only be an association in fact that engages in a pattern of racketeering activity." *Id.* Therefore, in this regard, Defendants are mistaken; CVLR has correctly interpreted the meaning of "enterprise" under § 1962(c).

person whose behavior the act was designed to prohibit, and, failing that, to punish." *United States v. Computer Sci. Corp.*, 689 F.2d 1181, 1190 (4th Cir. 1982), *overruled in part by Busby v. Crown Supply, Inc.*, 896 F.2d 833 (4th Cir. 1990).

In *Cedric Kushner*, the Supreme Court of the United States addressed the narrow question of whether the requirement of § 1962(c) that the "person" and "enterprise" be distinct is satisfied when the alleged enterprise is a closely held corporation and the alleged person is the president and sole shareholder employed by that corporation. 533 U.S. at 160. The Court concluded that such a "person" and "enterprise" were, in fact, distinct for purposes of RICO: "The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that." *Id.* at 163. Further, the Court reasoned that its ruling aligned with one of RICO's purposes; to wit, the protection of the public from those who unlawfully utilize an enterprise (whether legitimate or not) as a vehicle for the commission of unlawful activity. *Id.* at 164.

The Fourth Circuit's recent holding in *United States v. Reese*, 442 F. App'x 8 (4th Cir. 2011) comports with the Supreme Court's decision in *Cedric Kushner*. In *Reese*, which involved a criminal prosecution, the person alleged to have violated RICO was a physician and the enterprise he allegedly utilized was his medical practice of which he was the sole proprietor. *Id.* at 11. The court addressed whether the district court had abused its discretion by eliminating a proposed statement from a RICO instruction that would have informed the jury that the enterprise must be distinct from the defendant. *Id.* at 12. The government argued that such a distinction is established as a matter of law where the enterprise is a legal entity and the defendant is a person. *Id.* The court ultimately held that the instructions that were given fairly

stated the controlling law and did not err by omitting the aforementioned proposed statement. *Id.* Thus, applying *Cedric Kushner* and *Reese* to the case at hand, it is clear that CVLR has adequately alleged a RICO defendant (Mr. Wynne) and RICO enterprises (1650 Partners and Rivermont), notwithstanding the fact that they have the appearance of being mere alter egos.[7]

### 3. "Pattern of Racketeering Activity" under RICO

In order to state a claim under RICO, CVLR must allege that Mr. Wynne conducted the affairs of 1650 Partners and Rivermont "through a pattern of racketeering activity." 18 U.S.C. § 1962(c); *Sedima*, 473 U.S. at 496. In part, the pattern requirement "acts to ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions." *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683 (4th Cir. 1989); *see also US Airline Pilots Ass'n v. AWAPPA, LLC*, 615 F.3d 312, 317 (4th Cir. 2010) (noting that RICO's treble damages provision

---

[7] However, CVLR cannot also name 1650 Partners and Rivermont, the alleged enterprises, as defendants in its RICO cause of action. "The enterprise as such generally faces no section 1962(c) RICO liability." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1111 (D.C. Cir. 2009). Indeed, the only theory under which CVLR could argue that 1650 Partners and Rivermont are permissible defendants in its RICO claim would be one of vicarious liability. While the United States Court of Appeals for the Fourth Circuit has yet to squarely resolve the issue, the majority of circuits that have done so have concluded that an enterprise cannot be vicariously liable for the acts of a person who, in controlling or utilizing that enterprise, violates 18 U.S.C. § 1962(c). *See, e.g., id.; Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 619–20 (9th Cir. 2004); *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1411 (3d Cir. 1991); *Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*, 901 F.2d 404, 425 (5th Cir. 1990); *Schofield v. First Cmty. Corp. of Boston*, 793 F.2d 28, 32–34 (1st Cir. 1986); *Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chi.*, 747 F.2d 384, 401 & n.18 (7th Cir. 1984). As the *Schofield* court aptly remarked,
> the concept of vicarious liability is directly at odds with the Congressional intent behind section 1962(c). Both the language of that subsection and the articulated primary motivation behind RICO show that Congress intended to separate the enterprise from the criminal "person" or "persons." Indeed, there is unlikely to be a situation, in the absence of an express statement, in which Congress more clearly indicates that *respondeat superior* is contrary to its intent.

793 F.2d at 32. In *United States v. Knox*, No. 7:02CR00009, 2003 WL 22019046, at *4 (W.D. Va. Aug. 22, 2003), an unpublished case, the district court found in a criminal RICO case that the corporate enterprise could, on the basis of *respondeat superior*, also properly be named as a defendant. In reaching this conclusion, the court looked to the Fourth Circuit's pronouncement in *United States v. Najjar*, 300 F.3d 466, 484 (4th Cir. 2002) that "principles of corporate liability apply in the RICO context." From this language, the court inferred the Fourth Circuit's endorsement of the applicability of *respondeat superior* principles to corporate enterprises whose employees violate RICO. *Knox*, 2003 WL 22019046, at *3–4. However, as the district court in *Moses v. Martin*, 360 F. Supp. 2d 533, 550 (S.D.N.Y. 2004) observed, in *Najjar*, the government alleged an association-in-fact enterprise of which the corporation in question was only one piece. Therefore, neither *Najjar* nor *Knox* can be read to necessarily support *respondeat superior* liability in a case such as the instant one. Ultimately, I adopt the position of the aforementioned circuit courts that have found vicarious liability principles to be inapplicable to enterprises in the context of 18 U.S.C. § 1962(c).

is "primarily designed to provide society with a powerful response to the dangers of organized crime").

RICO itself rather unhelpfully defines a pattern of racketeering activity as "at least two acts of racketeering activity, one of which occurred after the effective date of [RICO] and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).  However, the Supreme Court has stated that "to prove a pattern of racketeering activity a plaintiff . . . must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S. at 239. Thus, this inquiry amounts to a "continuity plus relationship" test. *Id.*  I examine each of these prongs separately, bearing in mind that ultimately, "there is no mechanical formula to assess whether the pattern requirement has been satisfied; it is a commonsensical, fact-specific inquiry." *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 182 (4th Cir. 2002).

i. Relatedness

For the predicate acts to be related, they must have "'the same or similar purposes, results, participants, victims, or methods of commission, or otherwise [be] interrelated by distinguishing characteristics and [not be] isolated events.'" *H.J. Inc.*, 492 U.S. at 240 (quoting 18 U.S.C. § 3575(e), *repealed by* Sentencing Reform Act of 1984, Pub. L. No. 98-473, tit. II, § 212(a)(2), 98 Stat. 1987).  In the instant case, I find that CVLR has adequately alleged the relatedness of the predicate acts.  Although some of those predicate acts—for example, Mr. Wynne's alleged presentation of a forged 1650 Partners check and his alleged receipt of ill-gotten auto insurance proceeds—stand as outliers without apparent connection to other events other than the common denominator of Mr. Wynne's involvement, other predicate acts are plausibly interrelated.  For instance, CVLR has alleged that the insurance proceeds Mr. Wynne

24

fraudulently obtained for work that was never completed on the damaged riding center barn were later used to pay the deposit on his purchase of Ms. Foster's property at the foreclosure sale. Another example involves Mr. Wynne's utilization of the funds CVLR thought it was paying to Old Dominion on the "mortgage" for the riding center property. Allegedly, Mr. Wynne used that money to make payments on the Wachovia loan he had induced Ms. Marsh to obtain as a means of creating leverage over her. Yet another instance is the allegation that Mr. Wynne sought equity in the homes of Mr. Marsh and Ms. Foster in order to bolster loan applications or renewals submitted to Old Dominion.

Moreover, with respect to the predicate acts, CVLR has alleged similar purposes (Mr. Wynne's procurement of money and property), participants (Mr. Wynne utilizing either 1650 Partners, Rivermont, or both), victims (women without financial acumen), and methods (forgery and manipulation). Additionally, for all of the predicate acts, CVLR has pled facts demonstrating the time, place, and manner in which they were carried out, and has therefore, in this regard, met the heightened pleading requirement imposed by Federal Rule of Civil Procedure 9(b) for allegations of fraud. Therefore, as far as the relatedness component of the pattern requirement is concerned, CVLR has alleged adequate facts to nudge its RICO claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. However, relatedness alone is not sufficient to satisfy the pattern requirement; CVLR must also allege facts demonstrating the requisite continuity.

ii. Continuity

The continuity component of RICO's pattern requirement—"centrally a temporal concept"—derives from Congress's concern with "long-term criminal conduct." *H.J. Inc.*, 492 U.S. at 242. Thus, at bottom, it evinces Congress's desire to limit RICO's application to

25

"ongoing unlawful activities whose scope and persistence pose a special threat to social well-being." *Int'l Data Bank, Ltd v. Zepkin*, 812 F.2d 149, 155 (4th Cir. 1987).

The Supreme Court has explained that in the context of the pattern requirement, continuity refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. Thus, it can be said that there are two types of continuity: "closed-ended" and "open-ended." "Closed-ended" continuity exists when the "series of related predicates extend[s] over a substantial period of time." *Id.* at 242. On the other hand, "open-ended" continuity requires the plaintiff to plead facts demonstrating a "threat of continuity"—which is to say, facts that give rise to a reasonable expectation that the activity will "extend[ ] indefinitely into the future." *Id.* Because the allegations in CVLR's amended complaint do not make it especially clear which type of continuity purportedly exists, I will analyze both species.

In order to demonstrate closed-ended continuity, "a multi-factor test must be satisfied, and a careful assessment must be made of 'the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries.'" *Whitney, Bradley & Brown, Inc. v. Kammermann*, 436 F. App'x 257, 259 (4th Cir. 2011) (quoting *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986)). With respect to these factors, however, the courts, including the Fourth Circuit, have been reluctant to set forth any bright line rules to guide the inquiry. Instead, all of the factors must typically be analyzed and weighed.

As a general matter, in order for closed-ended continuity to exist, the racketeering activity must usually have taken place over the course of many years. *See, e.g., Professionals, Inc. v. Berry*, No. 91-1509, 1992 WL 64796, at *3 (4th Cir. Apr. 2, 1992) (finding that the

26

pattern requirement was met in a case in which the predicate acts took place over the course of three years); *Walk v. Balt. & Ohio R.R.*, 890 F.2d 688, 690 (4th Cir. 1989) (stating that a ten-year period was sufficient for closed-ended continuity); *Morley v. Cohen*, 888 F.2d 1006, 1008–09 (4th Cir. 1989) (concluding that the pattern requirement was met when the underlying scheme lasted for approximately five years); *Brandenburg v. Seidel*, 859 F.2d 1179, 1186 (4th Cir. 1988), *abrogated in part by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996) (assuming that the pattern requirement was satisfied where the predicate acts were committed over a span of more than three years); *United States v. Presgraves*, 658 F. Supp. 2d 770, 777 (W.D. Va. 2009) (finding that the pattern requirement was met when the predicate acts took place over an eight-year period); *Avalonbay Communities, Inc. v. Willden*, No. 1:07cv998, 2008 WL 2780983, at *5 (E.D. Va. July 16, 2008) (noting that the relevant time period was four years); *Toucheque v. Price Bros. Co.*, 5 F. Supp. 2d 341, 346 (D. Md. 1998) (identifying continuous commission of predicate acts over the course of three years); *but cf. ePlus*, 313 F.3d at 182 (finding pattern requirement was met despite the fact that the schemes only took place over the course of a period of months, not years).

Based on the facts set forth in the amended complaint, the alleged racketeering activity in the case at hand took place over the course of approximately three to four years. While this period of time is certainly longer than the mere weeks or months that have typically been held inadequate, it is also not especially long or noteworthy. Rather, it represents a time period closer to the low-end of the relevant spectrum. Moreover, while the predicate acts perpetrated may have been sufficiently related, there is no allegation that they were being committed continuously during that time span. Therefore, in the case at hand, the period of time alone cannot justify a finding of closed-ended continuity, thus necessitating examination of the remaining factors.

CVLR alleges the commission of six predicate acts, not all of which are related. As mentioned, in order to state a RICO claim, only two predicate acts are necessary to meet the floor set by the statute. 18 U.S.C. § 1961(5). However, most cases in which the pattern requirement has been met involve schemes with a multitude of related predicate acts. *See, e.g.,* *Professionals*, 1992 WL 64796, at *2–3 (observing that 58 predicate acts were committed); *Morley*, 888 F.2d at 1010 (remarking that there were "numerous" instances of mail fraud); *Brandenburg*, 859 F.2d at 1185–86 (describing large number of predicate acts); *Presgraves*, 658 F. Supp. 2d at 777 (stating that indictment had identified 14 predicate acts); *Avalonbay*, 2008 WL 2780983, at *5 (stating that hundreds of predicate acts were committed).

Additionally, CVLR has not alleged a wide variety of predicate acts; indeed, it has only asserted a few instances of wire fraud and a few instances of bank fraud. While such homogeny is not prohibitive of proceeding on a RICO claim, the variety of predicate acts is a factor that the courts are entitled to take into account. *See, e.g., Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (observing that only mail and wire fraud were alleged as predicate acts). On a related note, the predicate acts alleged by CVLR harmed only four victims, which is certainly relevant, but hardly evidence of wide-ranging racketeering activity. *See, e.g., ePlus*, 313 F.3d at 171 (citing the district court's reference to the large number of victims); *Professionals*, 1992 WL 64796, at *3 (describing sixteen victims); *Brandenburg*, 859 F.2d at 1186 (stating that there were more than 22,000 victims).

The final, significant factor that warrants mention here is the presence of multiple schemes. CVLR alleges only one scheme being perpetrated by Mr. Wynne through the enterprises of 1650 Partners and Rivermont.[8]  While the Supreme Court has held that one

---

[8] I observe that a "scheme" is a rather malleable concept without a self-evident definition. As the Supreme Court noted, a scheme "is in the eye of the beholder, since whether a scheme exists depends on the level of generality at

scheme is sufficient to make out a RICO claim, *H.J. Inc.*, 492 U.S. at 237, the presence of only one scheme nevertheless can be (and has been) taken into account in weighing whether the facts alleged demonstrate the continuity required by RICO, *see, e.g., GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 549 (4th Cir. 2001) (observing presence of one scheme); *Menasco*, 886 F.2d at 684 ("[T]he existence of a single scheme alone, while not dispositive, can be relevant to the continuity inquiry."); *Flip Mortgage Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988) (citing the single scheme that was perpetrated).

Consideration of the aforementioned factors leads me to conclude that CVLR has not demonstrated closed-ended continuity. However, as previously mentioned, the continuity element of the pattern requirement can also be satisfied by showing open-ended continuity.

An inquiry into open-ended continuity is different than one looking for the presence of closed-ended continuity. Open-ended continuity is characterized by related predicate acts that, looking forward, pose a "distinct threat of long-term racketeering activity." *H.J. Inc.*, 492 U.S. at 242; *see also Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1119 (D.C. Cir. 1991) (stating that open-ended continuity requires "far more than a hypothetical possibility of further predicate acts"). After careful consideration, I find that CVLR has not pled sufficient facts to demonstrate such a threat of long-term, continued criminal activity.

In order to bolster its claim that it has met the continuity requirement, CVLR alleges that "the consequences of the scheme have not yet been completed and are continuing." Am. Comp. ¶ 156. More specifically, CVLR claims: (1) that it remains without the benefit of its contract for

---

which criminal activity is viewed." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 n.3 (1989). What is more, "[t]here is no obviously 'correct' level of generality for courts to use in describing the criminal activity alleged in RICO litigation." *Id.* In the instant case, I find that CVLR's allegations evidence a single scheme being perpetrated by Mr. Wynne rather than several distinct, related schemes. *See* Am. Compl. ¶ 83 (discussing the paper discovered by Ms. Marsh that allegedly described Mr. Wynne's "unified scheme"); Am. Compl. ¶ 156 (utilizing the singular form "scheme" as opposed to the plural form).

the purchase of the riding center property; (2) that Ms. Foster remains without legal title to her home; (3) that Ms. Marsh remains under threat of foreclosure; and (4) that Rivermont continues to hold itself out as a bank on the internet.  However, it simply cannot be the case that such residual effects from Mr. Wynne's previous fraudulent activities represent the "threat of long-term, continued criminal activity" that open-ended continuity requires.  *GE Inv. Partners*, 247 F.3d at 549.  In other words, the fact that consequences of Mr. Wynne's predicate acts may still linger does not necessarily mean that Mr. Wynne, through the operation of his enterprises, poses a continued threat (or at least not any more so than any person who commits a crime).  As the court cogently framed this point in *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1264 (D.C. Cir. 1995), "[t]he only possible rationale that could support such a prediction—once a RICO violator, always a RICO violator—would deprive the pattern requirement of all meaning by establishing open-ended continuity whenever two or more predicate acts were shown."

Although CVLR may have been deprived of the benefits it bargained for under its contract with S & R Farm, and despite the fact that Ms. Foster and Ms. Marsh may not have title to their homes any longer, those alleged acts have already been perpetrated.  Thus, they cannot support CVLR's allegation that the scheme is ongoing and continuous.  Similarly, the fact that Rivermont may continue to advertise on the internet is of no moment.  Simply because Mr. Wynne may have, in the past, run Rivermont to serve his alleged racketeering ends does not necessarily mean that the entity itself, which could be run legitimately, poses a threat to the public or the alleged victims in the instant case simply by virtue of its continued existence.

In *H.J. Inc.*, for the first and only time, the Supreme Court offered an example of a threat of long-term racketeering activity that would satisfy the continuity requirement.  The Court

30

described a hoodlum who went around selling "insurance" in order to cover storekeepers against breakage of their windows, telling them that he would be by every month to collect payment so that they could continue their coverage. 492 U.S. at 242. "Though the number of related predicates involved may be small and they may occur close together in time," the Court remarked, "the racketeering acts themselves include a specific threat of repetition extending *indefinitely* into the future, and thus supply the requisite threat of continuity." *Id.* (emphasis added).

In the instant case, the only allegation that even arguably approaches such a threat of extending indefinitely into the future is CVLR's rather confusing contention that Mr. Wynne, to this day, threatens to allow Wachovia to foreclose on Ms. Marsh's property in South Carolina. However, CVLR fails to allege how Mr. Wynne has the ability to force Wachovia (or its successor) to foreclose or why the home has not been foreclosed on despite the fact that Mr. Wynne stopped making mortgage payments on Ms. Marsh's behalf in September 2008. Moreover, even accepting this allegation as true, which I must, the mere assertion of one instance of a continuing threat—which, notably, does not even form the basis of any of the predicate acts alleged—is simply not enough to establish a threat of continued racketeering activity. In the end, CVLR's effectively unsubstantiated claims that the scheme in this case is continuous are inadequate to reach that conclusion. *See Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 783 (7th Cir. 1994) ("A threat of continuity cannot be found from bald assertions such as '[the defendant] continues his racketeering activities.'").

Separately, I observe that a plaintiff cannot demonstrate open-ended continuity if the racketeering activity has a "built-in ending point." *GE Inv. Partners*, 247 F.3d at 549. In the case at hand, CVLR alleges the existence of one unified scheme being perpetrated by Mr.

31

Wynne, the object of which was the defrauding of the four victims (CVLR, Ms. Rivers, Ms. Foster, and Ms. Marsh). However, accepting the allegations as true, I find it evident that Mr. Wynne—unlike the Supreme Court's fictional hoodlum in *H.J. Inc.*—has accomplished the end of that scheme. Indeed, according to CVLR's own assertions, all four victims have been bilked, just as Mr. Wynne intended. Consequently, the fraudulent scheme devised by Mr. Wynne has necessarily come to an end, notwithstanding, as previously mentioned, any negative effects that might still linger for the victims. And when such a scheme has reached its ending point, it cannot, either legally or logically, be characterized as continuous. For these reasons, I find that CVLR has failed to allege sufficient facts demonstrating either closed-ended or open-ended continuity. Accordingly, the pattern requirement has not been satisfied.

Ultimately, this outcome is appropriate in light of the fraud alleged in this case, which, though it may very well be criminal, does not fall within the sort of pattern of racketeering for which Congress provided civil remedies in RICO. Indeed, RICO "'does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity.'" *US Airline Pilots*, 615 F.3d at 317 (quoting *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006)). In the case at hand, the few instances of bank fraud and wire fraud alleged, while somewhat related, do not amount to such long-term, habitual criminal conduct. Further, they do not threaten "*indefinite* repetition," *US Airline Pilots*, 615 F.3d at 320, or pose a "special threat to social well-being," *Zepkin*, 812 F.2d at 155. Simply put, the allegations that compose CVLR's RICO claim are "not sufficiently outside the heartland of fraud cases to warrant RICO treatment." *Al-Abood*, 217 F.3d at 238.[9] They are better remedied with state law causes of action. Accordingly, I will dismiss CVLR's RICO claim.

---

[9] In this vein, the United States Court of Appeals for the Seventh Circuit has observed:

32

## B. State Law Claims

Absent a surviving RICO claim, CVLR is left only with state law claims for breach of contract, tortious interference with the performance of contract, and business conspiracy in violation of Virginia Code § 18.2-499. In light of the fact that there is no basis for diversity jurisdiction in this matter, I will exercise my discretion to dismiss a case in which all federal claims have been dismissed and only state law claims remain. 28 U.S.C. § 1367(c); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).

## IV. CONCLUSION

For the reasons stated herein, CVLR's RICO claim is dismissed and I decline to assert supplemental jurisdiction over the remaining state law claims. Accordingly, this case shall be dismissed. An appropriate order accompanies this memorandum opinion.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

Entered this ___2nd___ day of April, 2012.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

---

[C]ivil RICO plaintiffs persist in trying to fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions. While it is clear that the scope of civil RICO extends beyond the prototypical mobster or organized crime syndicate, it is equally evident that RICO has not federalized every state common-law cause of action available to remedy business deals gone sour.

*Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992) (citations omitted).