**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-1591

CVLR PERFORMANCE HORSES, INC.,

        Plaintiff – Appellant,

   v.

JOHN L. WYNNE; 1650 PARTNERS, LLC; RIVERMONT CONSULTANTS, INC., f/k/a The Rivermont Banking Co., Inc.,

        Defendants – Appellees,

   and

OLD DOMINION NATIONAL BANK; ADVANTAGE TITLE & CLOSING LLC; S & R FARM, LLC; RALPH BECK; SHANA LESTER, f/k/a Shana Beck,

        Defendants.

No. 12-1787

CVLR PERFORMANCE HORSES, INC.,

        Plaintiff – Appellant,

   v.

JOHN L. WYNNE; 1650 PARTNERS, LLC; RIVERMONT CONSULTANTS, INC., f/k/a The Rivermont Banking Co., Inc.,

        Defendants – Appellees,

   and

```
OLD DOMINION NATIONAL BANK; ADVANTAGE TITLE & CLOSING LLC;
S & R FARM, LLC; RALPH BECK; SHANA LESTER, f/k/a Shana Beck,

                    Defendants.
```

---

Appeals from the United States District Court for the Western District of Virginia, at Lynchburg. Norman K. Moon, Senior District Judge. (6:11-cv-00035-NKM)

---

Argued: March 21, 2013                    Decided: May 29, 2013

---

Before TRAXLER, Chief Judge, SHEDD, Circuit Judge, and David A. FABER, Senior United States District Judge for the Southern District of West Virginia, sitting by designation.

---

Reversed in part, dismissed in part, and remanded by unpublished opinion. Judge Shedd wrote the opinion, in which Chief Judge Traxler and Senior Judge Faber joined.

---

**ARGUED:** Gary M. Bowman, Roanoke, Virginia, for Appellant. Chad Allan Mooney, PETTY, LIVINGSTON, DAWSON & RICHARDS, PC, Lynchburg, Virginia, for Appellees. **ON BRIEF:** John E. Falcone, PETTY, LIVINGSTON, DAWSON & RICHARDS, PC, Lynchburg, Virginia, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit.

SHEDD, Circuit Judge:

CVLR Performance Horses, Inc. appeals the district court's order dismissing its claims against John Wynne, 1650 Partners, LLC, and Rivermont Consultants, Inc. pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons explained below, we reverse the district court's order and remand for further proceedings.[1]

### I.

Because this appeal stems from a dismissal under Rule 12(b)(6), we accept the facts as alleged in CVLR's Amended Complaint. See Martin Marietta v. Int'l. Tel. Satellite Org., 991 F.2d 94, 97 (4th Cir. 1992). Wynne is the sole owner of Rivermont and 1650 Partners, both of which Wynne used in his fraudulent schemes. Although Rivermont was not authorized at any relevant time to engage in banking activities under Virginia law, Wynne held out Rivermont as a bank as part of his enterprise and used this entity in various ways to facilitate his fraudulent schemes, many of which "targeted women in financial distress, who thought he was a banker." J.A. 57. Wynne "continues to advertise [Rivermont] on the internet as a

---

[1] CVLR also appeals the district court's order denying its motion for relief from the order granting the Appellees' motion to dismiss. Because we reverse the district court's dismissal of CVLR's complaint, we dismiss this portion of the appeal as moot.

3

bank, providing mortgage loans, construction loans, and reverse mortgages." J.A. 57 (internal quotation marks omitted).

We first discuss the schemes that involved CVLR or its President, Crystal Rivers. In late 2006, Wynne advertised pasture land for rent, and Rivers responded to the advertisement on behalf of CVLR. After Rivers contacted Wynne, Wynne convinced her to purchase a horseback riding center for CVLR. Wynne told Rivers that Rivermont was a bank that would finance the purchase. However, because Rivermont was not a bank, Wynne arranged for Old Dominion National Bank to provide the financing. Wynne then proceeded to cut CVLR out of the transaction and arranged for 1650 Partners to purchase the riding center with Rivers serving as a guarantor on the loan from Old Dominion to 1650 Partners. Even after the transaction was complete, Rivers incorrectly believed that CVLR owned the riding center.

In February 2007, Wynne worked with Rivers to purchase and finance a truck for CVLR's use. However, unbeknownst to Rivers, Wynne engaged in a series of acts over the next seven months that left Rivermont owning the truck and CVLR obligated to repay the loan. Wynne also told the financing institution that Rivermont would purchase insurance on the truck, but he arranged for Rivers to insure it instead.

4

Also in February 2007, Wynne purchased another truck in Rivermont's name but added it to Rivers' insurance policy without her knowledge. Thereafter, Wynne's son totaled the truck. At that point, Wynne convinced Rivers' insurance company that Rivers was not the insured party and that the insurance company should pay Wynne the value of the truck. Thus, the insurance company paid Wynne $10,630.

Wynne proceeded to divert more insurance funds from CVLR to Rivermont over the first several months of 2008. Because Rivers believed that CVLR owned the riding center, she insured it, and, when high winds damaged the riding center's barn, CVLR filed an insurance claim. The insurance company approved the claim and issued checks jointly to CVLR and Old Dominion, the bank that held the mortgage on the riding center. Wynne then asked an Old Dominion employee to transfer the funds into the account of 1650 Partners, telling the employee that he would use the money to repair the wind damage and make "capital additions" to the riding center. J.A. 21 (internal quotation marks omitted). The Amended Complaint does not indicate whether the Old Dominion employee complied. However, it alleges that Wynne submitted false invoices to the insurance company and made misrepresentations to Old Dominion that led Old Dominion to believe that one of Wynne's employees had repaired the barn, which, in fact, remained unrepaired. Old Dominion then issued

5

checks to Wynne's employee, who endorsed the checks to Rivermont.

By October 2008, Rivers had become a member of 1650 Partners. Wynne exploited Rivers' status as a member by forging her signature on a 1650 Partners check to himself for $3000.

Wynne also used Rivermont and 1650 Partners in schemes that did not involve CVLR or Rivers. For example, Karen Foster, who believed that Rivermont was a bank, sought financing from Rivermont in early 2006. Over time, Wynne loaned Foster small amounts of money, and Foster came to consider Wynne a friend. In August 2006, Wynne convinced Foster to execute a note agreeing to repay him $40,000 for the series of small loans he had made and to secure the note with Foster's home. Wynne listed Foster's home as an asset on a financial statement he submitted to a bank in conjunction with a loan he sought for 1650 Partners. On that financing statement, Wynne stated that the home was not subject to any mortgage, which was false because Bank of America held a mortgage on the home. The bank made the loan in April 2009 based, in part, on Wynne's false representation in the financial statement.

Finally, Wynne used Rivermont in a scheme against another acquaintance, Vicki Marsh. In November 2006, Wynne bought a certificate of deposit for Rivermont from First Bank and Trust Company. He then used his status as a customer of First Bank to

6

convince the bank to open a credit line for Marsh, which increased her credit score. With Marsh's credit score increased, another bank was willing to loan her approximately $500,000, secured by a mortgage on her property on Pawley's Island, South Carolina. However, Wynne arranged for the $500,000 to be paid to him, not Marsh. Wynne made payments on the loan for approximately 18 months until he ceased making payments in September 2008. Once the payments had fallen into arrears, Wynne attempted to purchase Marsh's interest in the home from the mortgage holder for a reduced price.

## II.

CVLR sued the Appellees and several other defendants in federal court, asserting one claim for violating the Racketeering and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and three state-law claims.

The Appellees moved to dismiss under Rule 12(b)(6), arguing that the Amended Complaint failed to state a claim upon which relief may be granted as to each count asserted against the Appellees. The district court granted the motion as to the RICO claim. Because no federal claims remained in the litigation, the district court declined to exercise supplemental jurisdiction and dismissed the action. CVLR filed a Rule 60(b) motion for relief from the dismissal, which the district court denied.

7

III.

We review the district court's dismissal of CVLR's RICO claim de novo. Wag More Dogs, Ltd. Liab. Corp. v. Cozart, 680 F.3d 359, 364-65 (4th Cir. 2012). To survive the Appellees' Rule 12(b)(6) motion, CVLR's Amended Complaint must establish "facial plausibility" by pleading "factual content that allows the court to draw the reasonable inference that [the Appellees are] liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

RICO imposes civil liability for various types of "racketeering activity," 18 U.S.C. § 1962, and should be "liberally construed to effectuate its remedial purposes." Boyle v. United States, 556 U.S. 938, 944 (2009) (internal citations omitted). Although "[t]he occasion for Congress' action [when it passed RICO] was the perceived need to combat organized crime," RICO is "not limited in application to organized crime." H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 248 (1989). Courts have thus applied RICO in a variety of contexts outside the realm of traditional organized crime. See, e.g., United States v. Pryba, 900 F.2d 748 (4th Cir. 1990) (applying RICO against pornographers); Northeast Women's Ctr., Inc. v. McMonagle, 868 F.2d 1342 (3d Cir. 1989) (applying RICO against antiabortion activists).

8

Among other things, RICO prohibits being "associated with any enterprise . . . [and] conduct[ing] or participat[ing] . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). To allege "a pattern of racketeering activity," a plaintiff must allege acts of racketeering that are both related and continuous. GE Inv. Private Placement Partners II v. Parker, 247 F.3d 543, 549 (4th Cir. 2001). The district court found that the racketeering acts alleged in the Amended Complaint were not sufficiently continuous to support a RICO claim.[2] We disagree.

Two types of continuity can support a RICO claim: "closed-ended" or "open-ended." Id. Although, the district court found that the Amended Complaint did not plead sufficient facts to show either type of continuity, CVLR only challenges the district court's conclusion that the Amended Complaint fails to support an inference of open-ended continuity. We find that facts pled in the Amended Complaint do support an inference of open-ended continuity and that the district court erred by concluding otherwise.

---

[2] RICO defines "racketeering activity" as "'any act or threat involving' specified state-law crimes, any 'act' indictable under various specified federal statutes, and certain federal 'offenses.'" H.J. Inc., 492 U.S. at 232 (quoting 18 U.S.C. § 1961(1)). The Appellees do not argue that the Amended Complaint failed to allege "racketeering activity" within the meaning of RICO or that the acts of racketeering were unrelated.

9

In H.J. Inc., 492 U.S. at 241, the Supreme Court stated that a plaintiff establishes open-ended continuity by showing "past conduct that by its nature projects into the future with a threat of repetition." The Court gave several examples—that were illustrative but not exhaustive—of facts that would establish open-ended continuity. One example involved racketeering acts that, on their face, pose "a distinct threat of long-term racketeering activity," such as where a hoodlum demands payment from storekeepers not to break their windows and states that he will return each month demanding the same payment. Id. at 242. The two other examples involved situations where racketeering acts are "part of an ongoing entity's regular way of doing business." Id.

The district court's analysis focused on the first example from H.J. Inc. and concluded that CVLR failed to plead open-ended continuity because each racketeering act did not, on its face, threaten to continue long term. However, the district court's analysis overlooked the more general point that the Appellees' conduct "projects into the future with a threat of repetition." Id. at 241. The Amended Complaint alleges that Wynne used Rivermont and 1650 Partners for over three years in a series of racketeering acts. In particular, Rivermont's function as a bank was an integral part of the RICO operation because Wynne lured victims into the scheme by holding Rivermont

10

out as a bank or otherwise used Rivermont to facilitate his scheme. CVLR also alleges that Rivermont continues to advertise as a bank, and the Amended Complaint creates no inference that Rivermont has ended its fraudulent activities. Therefore, the allegations in the complaint support an inference that the activity "projects into the future with a threat of repetition" and that racketeering acts are the Appellees' "regular way of doing business." Id. 241, 242; see also EPlus Technology Inc. v. Aboud, 313 F.3d 166, 182-83 (4th Cir. 2002) (three examples of looting companies of assets prior to filing for bankruptcy established open-ended continuity).

The district court also concluded that the Amended Complaint fails to plead open-ended continuity because the Appellees' racketeering activity had a "'built-in ending point'." J.A. 104 (quoting GE Investment, 247 F.3d at 549). Specifically, the district court found it implausible that the racketeering acts would continue into the future because all of the victims identified in the Amended Complaint "have been bilked" and, presumably, know better than to do more business with Appellees. J.A. 105. Again, we disagree. "The lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity." United States v. Busacca, 936 F.2d 232, 238 (6th Cir. 1991). Instead, "the threat of continuity must be viewed at the time

11

the racketeering activity occurred." Id. Here, as explained above, at the time the Appellees' acts occurred, the conduct "project[ed] into the future with a threat of repetition," H.J. Inc., 492 U.S. at 241, and there was no other indication that Wynne's conduct was to be limited to only the identified victims. Thus, the victims' discovery of the Appellees' misconduct does not prevent CVLR from establishing open-ended continuity.

In sum, we conclude that the Amended Complaint pleads open-ended continuity. Because the district court based its dismissal on a conclusion to the contrary, we reverse the district court's order granting the motion to dismiss.

IV.

For the reasons explained above, we (1) reverse the district court's order granting Appellees' motion to dismiss, (2) dismiss as moot CVLR's Rule 60(b) motion, and (3) remand for further proceedings in the district court.

REVERSED IN PART,
DISMISSED IN PART,
AND REMANDED

12